Littleton, Judge,
delivered the opinion of the court:
In 97 C. Cls. 391, in the first hearing under Rule 39 (a) on the question as to plaintiff’s legal right to recover, we held that defendant should account to the plaintiff under the terms of the agreement of March 2,1889 (25 Stat. 888), for $5,307,-655.87, representing the proceeds derived from the disposition of 9,261,592.62 acres of land ceded by plaintiff, under the agreement, from the Great Sioux Reservation. In the findings and opinion entered, following further proceedings on accounting, published in 105 C. Cls. 658, 710, we determined and stated the account between the plaintiff and the Government to June 30,1925, and held that on the basis of a proper accounting under the terms and conditions of the agreement of 1889 no amount remained due plaintiff. The judgment *42 dismissing of plaintiff’s motion for a new trial.
On December 9,1946, the Supreme Court, in case No. 368, made and entered the following order:
Pee Curiam : The petition for rehearing is granted. The order entered October 21,1946, denying certiorari is vacated and the petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the Court of Claims in order to enable that court to determine whether the Act of August 13, 1946, gives rise to any claims which petitioners may assert to affect the judgment heretofore entered in this cause, as to which this Court means to intimate no opinion.
The Act of August 13,1946 (60 Stat. 1049-1066; 25 U. S. Code, 1946 Ed., 70~70v), established the Indian Claims Commission, and the jurisdiction of the Commission was defined in section 2, as follows:
The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty oi cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. No claim accruing alter the date of the approval of this Act shall be considered by the Commission.
All claims hereunder may be heard and determined by the Commission notwithstanding any statute of limita *43 tions or laches, but all other defenses shall be available to the United States.
In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U. S. C. sec. 250), as amended; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for expenditures made pursuant to the Act of June 18, 1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4,1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public, projects for the relief of unemployment or to increase employment, and for work relief (including the Civil Works Program) shall not be a proper offset against any award.
With respect to cases pending in this court on August 13, 1946, section 11 of the Act provided as follows:
Any suit pending in the Court of Claims or the Supreme Court of the United States or which shall be filed in the Court of Claims under existing legislation, shall not be transferred to the Commission: Provided, That the provisions of section 2 of this Act, with respect to the deduction of payments, offsets, counterclaims and demands, shall supersede the provisions of the particular jurisdictional Act under which any pending or authorized suit in the Court of Claims has been or will be authorized: Provided further, That the Court of Claims *44 in any suit pending before it at the time of the approval of this Act shall have exclusive jurisdiction to hear and determine any claim based upon fair and honorable dealings arising out of the subject matter of any such suit.
Pursuant to the mandate of the Supreme Court filed January 20,1947, and an order entered by this court February 3, 1947, plaintiff filed a supplemental petition. In this petition plaintiff alleges that under the terms of the original jurisdictional Act as enlarged and extended by sections 2 and 11 of the Act of August 13,1946, above-quoted, expenditures totaling $8,438,038.38 made by the Government under the provisions of section 17 of the agreement of March 1889, for “beneficial objects to allottees” (findings 9 (a) and (b), and 15,105 C. Cls. 658), should now be held not to be reimbursable expenditures under sections 17 and 22 of the 1889 agreement and chargeable against plaintiff’s permanent fund, including interest, of $10,373,382.76 (findings 9 (a) and (b), sufra). Plaintiff therefore asks that this sum of $8,438,038.38 be eliminated as a reimbursable charge and as an offset against its funds, and that judgment be entered in its favor for the net sum of $3,526,754.16 with interest.
Defendant has filed a motion to dismiss the supplemental petition on the ground that all questions now presented by the supplemental petition were fully argued, considered and decided by the court in its findings of fact and opinion of February 4, 1946, and that the Act of August 13, 1946, contains no provision which gives rise to any claim which plaintiff may assert to affect or change the findings and judgment heretofore entered stating the account between the parties and dismissing the petition.
We are of the opinion that the motion to dismiss must be sustained.
In the supplemental petition plaintiff first alleges and contends that the expenditures from public funds in the total sum of $8,438,038.38 for beneficial agricultural objects for allottees (live stock, farm animals, agricultural implements and equipment, per capita cash payments and payments of the commuted cash values of benefits, finding 15,105 C. Cls. 685-691), disbursed under the provisions of section 17 of the 1889 agreement, were made in compliance with and under *45 tbe provisions of section 5 of the agreement of September 26,1876, ratified February 28, 1877 (19 Stat. 254), in fulfillment of an obligation of the Government, and, were not, therefore, legally a part of the reimbursable expenditures referred to and contemplated by sections 17 and 22 of the agreement of March 2, 1889.
We considered and denied this claim in our findings and opinion of February 2,1946, and we find no provision in section 2 of the Act of August 13,1946, which requires or warrants a modification of our prior decision. In our findings 17, and 20-23 (105 C. Cls. 693-697 and 700-709), we set forth the net expenditures for education and subsistence, totaling $39,109,531.61, made by the Government to June 30, 1925, in fulfillment of its obligations under section 5 of the agreement of 1877, and which we held were not chargeable against plaintiff’s funds derived from the sale of surplus lands, and interest thereon, under the 1889 agreement.
Plaintiff next alleges and contends that in the negotiation of the agreement of 1889 the Indians of the plaintiff tribe were led to believe that the agricultural benefits and cash payments, referred to in section 17 of that agreement, would be furnished and paid for by the Government from public funds, and that, therefore, on the basis of fair and honorable dealing, the expenditure of the sum of $8,438,038.38 for these purposes should not be charged to the plaintiff tribe. This claim was also made by plaintiff and was considered and denied in our findings and opinion of February 4,1946. On the record we find no substantial support for the view that fair and honorable dealing, within the meaning of that term as used in sections 2 and 11 of the Act of August 13,1946, requires or justifies the conclusion that these expenditures should be charged to the Government rather than to the plaintiff. The treaty of 1868 contemplated that, with the payments and Government assistance therein provided, the Sioux Indians would become self-supporting. The obligations of the Government under that treaty had been fulfilled and the treaty had expired prior to 1876. However, the Government continued to gratuitously support the tribe at a cost to it of more than $1,000,000 a year. The agreement of February 28, 1877 (made in connection with the acquisition *46 by the Government of the Black Hills area of plaintiff’s reservation, see, 97 C. Cls. 613), contemplated that the plaintiff tribe would become self-supporting with the assistance of the Government and the expenditure of the funds therein provided, for subsistence, work of civilization, schools and instruction in mechanical and agricultural arts. The Indians had a definite obligation to become self-supporting as soon as possible. They had no valid legal or moral claim for perpetual support by the Government out of public funds. Especially was this true when they had lands with and upon which they could provide for their own support. By 1888 the Congress, having the right to legislate with respect to the properties and affairs of the Indians for their benefit, concluded that the lands of plaintiff’s vast reservation were not being properly utilized for the best interests of the members of the tribe; that the reservation should be divided into certain separately defined reservations for the various groups or bands of the tribe; that the surplus land, in excess of the separate reservations, should be sold to provide funds to be held in trust (at interest at 5% to be paid by the Government) and used and expended for the benefit of the Indians, so that with their own property and funds they would be able to support themselves, and that certain of the lands within the separate reservations be allotted, in the quantities specified, in severalty and patented to the various members of the tribe. The agreement of March 2,1889, was, therefore, proposed in the form of an enactment by Congress, to become effective upon acceptance by the Indians and proclamation by the President. The agreement as proposed by Congress was accepted. It became effective February 10, 1890.
The record satisfactorily shows that the Indians were not deceived or misled by the treaty Commissioners. No representations were made by the Commissioners which would justify the members of the tribe in believing that the Government would provide, at its expense, the beneficial agricultural objects and cash payments mentioned in section 17 of the agreement. The record shows that the Indians endeavored to have the Commissioners interpret the agreement as placing that obligation upon the Government under the treaty *47 of 1868 and tbe agreement of 1877, and that the Commissioners refused to do so, as we held in our findings and opinion of February 4, 1946. Sections 17 and 22 of the agreement clearly provided that reimbursement for the expenditures made under section 17, should be made to the Government when the permanent fund of principal and interest was set up at the end of ten years, as specified and required by the agreement. The agreement of 1889, as proposed by Congress and the President, was fully interpreted, read and explained to the Indians by the Commissioners, and full opportunity for discussion was afforded. The Indians had copies of the agreement, and after the meetings and discussions further considered the same before they voted upon it. Upon a careful study of the entire record and the transcript of the proceedings of the negotiations, we found in our decision of February 4,1946, and we affirm that finding, that there is no reason to suppose that the plaintiff tribe did not understand the meaning of the provision in section 17, which stated “That after the Government has been reimbursed for the money expended for said Indians under the provisions of this act * * And, also, we find no reason to suppose that plaintiff did not understand the provision in section 22, which stated that all money accruing from the disposal of lands shall be paid into the Treasury of the United States and “be applied solely as follows: First, to the reimbursement of the United States for all necessary actual expenditures contemplated and provided for under the provisions of this act, and the creation of the permanent fund hereinbefore provided [in section 17]; and after such reimbursement to the increase of said fund for the purposes hereinbefore provided.” That the agreement contemplated, in addition to the quoted provisions, that plaintiff should bear the cost of the beneficial agricultural objects and cash payments here involved (which were to be supplied from public funds during the ten-year period, provided for the disposal of the surplus lands, at the end of which period the permanent fund of principal and interest was to be set up), is shown by the provision in Section 17 which, following the provision for reimbursement of expenditures theretofore made during the ten-year period, authorized the Secretary of the Interior to *48 expend not to exceed ten percent of the principal of the permanent fund “in the purchase of agricultural implements, teams, seeds, including reasonable cash payments per capita, and other articles necessary to assist them [the Indians] in agricultural pursuits * * By the provisions for reimbursement the expenditures during the ten-year period were placed in the same category as similar expenditures to be made thereafter. The whole purpose of the agreement of 1889 was to assist and enable the plaintiff tribe to fulfill the clear obligation which rested upon it to become self-supporting. The Government got nothing under the terms of the agreement, except relief to some extent from having to support the tribe of some 20,000 members. Even after the making of the agreement of 1889 the Government continued, as the accounting to June 30,1925 shows, to fulfill the obligation which it assumed under article 5 of the agreement of 1877, to support the Indians to the extent necessary. In addition, the Government contributed, without reimbursement, interest at five percent per annum ($150,000 or more a year) on the permanent fund, as long as such fund lasted, and also provided, without charge, large sums from public funds for elementary and industrial schools, and mechanical, industrial, and agricultural education and instruction.
We think Congress was dealing fairly and honorably with the plaintiff tribe when it imposed the requirement that the expenditures in question be reimbursed to it out of the funds derived by the tribe from the sale of the surplus lands. The expenditures were strictly advancements by the Government from public funds, without obligation, as was the advancement of the $3,000,000, and, in fairness, the plaintiff tribe should be required to repay the same.
Plaintiff next alleges and contends that the sum of $8,438,-038.38, expended for the agricultural objects and benefits, was for an educational purpose under the 1889 agreement and is, therefore, denied to defendant as an offset under section 2 of the Act of August 13, 1946, and the course of conduct of the officials of the Interior Department. In our opinion of February 4, 1946, we denied plaintiff’s claim that this sum was expended for educational purposes within the meaning *49 of the agreement of 1889, and we find no reason to change that conclusion. Moreover, the amount is not allowed and cannot be treated as an offset of an expenditure gratuitously made for educational purposes, as that term is usually and generally understood, but is allowed to defendant as an expenditure of a sum advanced and expressly made reimbursable by sections 17 and 22 of the agreement. The sum of $8,438,-038.38 is a gratuitous expenditure only to the extent that it exceeded, with other expenditures, the total amount of the permanent fund and interest. But we think it is clear that this excess of $4,911,284.22 was not an expenditure for “education,” as that term was used in section 2 of the Act of August 13,1946. Industrial schools and education were mentioned in the 1889 agreement, but these expenditures were not placed in that class. Therefore, the provision of Section 2 of the Act of August 13, 1946, with reference to the non-allowance as offsets of gratuitous expenditures for educational purposes, has no application here.
The fact that the officials of the Interior Department failed to comply with the provisions of the agreement of 1889 by failing to state the account between the parties and to set up the permanent fund of principal and interest, less reimbursements, on February 10,1900, did not have the effect, as we previously held, of changing the clear terms of the agreement. Apparently, the reason they did not set up the account was because they considered that the reimbursable expenditures would be substantially equal to the proceeds from the disposition of the surplus lands.
For the reasons hereinbefore stated, we hold that the Act of August 13, 1946, does not give rise to any claim which plaintiff is entitled to assert to affect the findings, judgment and opinion heretofore entered February 4, 1946. The defendant’s motion to dismiss is, therefore, sustained, and the supplemental petition is dismissed. The judgment as set forth in the conclusion of law heretofore entered February 4, 1946, is approved, affirmed, and re-entered. It is so ordered.
Howell, Judge; MaddeN, Judge; Whitakek, Judge; and JoNes, Chief Justice, concur.