MaddeN, Judge,
delivered the opinion of the court:
Plaintiff sues because, it alleges, the defendant has failed to perform its obligations under its agreement with plaintiff as set forth in the Act of March 2, 1889 (25 Stat. 888).
By a treaty of April 29, 1868 (15 Stat. 635), between the parties herein there was set apart as a reservation for the Sioux Indians a large area in what are now North and South Dakota. A later “agreement” was made between the parties and embodied in an act of February 28, 1877 (19 Stat. 254), the validity of which was attacked by plaintiff in another case recently decided by this court.[2] By that transaction, the western boundary of the reservation was said to be moved east to the one hundred and third meridian of longitude except for the distance between the north and south forks of the Cheyenne Fiver which flowed to their confluence east of that meridian. For that distance the two streams down to their confluence were to constitute the western boundary of the reservation.
By an act of March 2,1889, which embodied an agreement between the parties, the validity of which is conceded by both parties, certain areas of the diminished reservation were set apart for various groups of the Sioux. The remainder of *397 the reservation land was ceded to the United States for purposes described in the act. The ceded land was to be restored to the public domain and opened for settlers, and the settlers were to be charged a specified amount per acre, and such land as was not sold within ten years was to be taken by the United States at a specified price. All money accruing from the disposal of the land was to be paid into the Treasury to create a fund to be maintained for the Sioux or applied to specified purposes for their benefit.
Plaintiff claims that the fund was never fully set up and that much of what was set up has been misappropriated by the defendant. >
At this stage of the case, not much is ripe for decision, even under Rule 39 (a) of this court. As to $5,307,655.87, the proceeds of 9,261,592.62 acres of the lands covered by the agreement, the parties do not dispute that the defendant was under a duty to put that amount in plaintiff’s fund, and to hold it or expend it for plaintiff’s benefit pursuant to the agreement. But that fact, in itself, does not create even a prima facie liability on the part of the defendant in this suit. The defendant could perform its duty under the agreement as well by expending the money for plaintiff as by holding it for plaintiff. The defendant has offered a report of the General Accounting Office showing in detail the receipts and expenditures on account of the fund, which the defendant claims proves that it has more than performed its obligations under the contract. Plaintiff contends that this offer is premature; that under Rule 39 (a) plaintiff is entitled to a judgment, and that thereafter the defendant may put in offsets to reduce the amount of the judgment.
As we have indicated above, we disagree with plaintiff. Plaintiff does not make out its case until it shows that the defendant has failed to set up the fund, or, having set it up, has failed to use it in accordance with the agreement. Before we can decide whether ..the contract has been breached, plaintiff must show that the General Accounting Office report is wrong, or that the disposition of the funds as there shown, was not in accord with the agreement.
There is, however, one element of the case which is ripe for decision. As we have said, the parties agree that the defendant received 9,261,592.62 acres under the cession, and *398 that $5,807,655.87 should have gone into the fund as the proceeds of those acres. Plaintiff contends however that 271,482.57 additional acres were ceded, whose proceeds were $147,237.22, which should have been but was not put into plaintiff’s fund. The defendant denies that these acres were ceded, contending that plaintiff did not own them at the time of the agreement of 1889 because it had already ceded them to the United States by its agreement ratified February 28, 1877. See Finding 3.
Plaintiff claims that, though for the purposes of this case it may be assumed that what plaintiff ceded in 1889 included no lands lying west of the western boundary of the Sioux reservation as diminished by the agreement of 1877, and though the agreement of 1877 in terms fixed meridian 103° as that western boundary, and though the acres here in dispute lie west of meridian 103° as accurately located, yet these acres still belonged to plaintiff in 1889, and were ceded by the agreement of that year.
Plaintiff’s exposition of this seeming paradox is as follows. When Congress, in the Act of 1877 diminishing the former Sioux reservation, set the new western boundary of the diminished reservation at meridian 103°, it really meant meridian 26° west of Washington, because it erroneously assumed that meridian 103° west of Greenwich was identical with 26° west of Washington. Since there were no marks on the ground indicating the intended boundary, and since there had been no survey to fix the location of meridian 103°, the Sioux had no intention one way or another in making the agreement. In that situation the intention of Congress is controlling, at least if to depart from it would prejudice the other party to the agreement. Hence, plaintiff says, the real western boundary of the diminished Sioux reservation fixed by the agreement of 1877, was as Congress intended, the line of meridian 26° west of Washington. But that was in fact 3'2.3", or, at that latitude, about two and one-half miles, west of true meridian 103°. From this discrepancy resulted the strip of land, two and oñe-half miles wide and extending north and south the entire length of the western boundary of the reservation, except for the distance that that boundary ran along the North and South Forks of the Cheyenne River to their confluence.
*399 Plaintiff’s explanation of this alleged error of Congress is that Major L’Enfant, in laying out the District of Columbia, placed the east and west center of the White House and the center line of Sixteenth Street, Northwest and Southwest, exactly on what he supposed to be meridian 77° west of Greenwich; that in fact this line.lay S'2.S", west of meridian 77°, but that the error was not discoverable until the laying of the Atlantic Cable so that time could be transmitted instantaneously from Greenwich to Washington, and was not officially discovered until 1882; and that in the meantime in all surveys made by the Government it was assumed that, in order to properly locate any meridian west of Greenwich, the surveyor need only add 77° to his measurement west from Washington.
Plaintiff’s principal authority for this asserted history is the report of the General Accounting Office, filed in this and other related suits of plaintiff in this court.
A part of that report appearing in Yol. I, pp. 402-404, is as follows:
In connection with the eastern and western boundaries of the Great Sioux Reservation as it existed at the time of the passage of the aforesaid act of March 2, 1889, i. e., the ninety-ninth and one hundred and third degrees of longitude west of Greenwich, respectively, as discussed on this and the preceding pages 400 and 401, an examination of the maps of the Territory of Dakota on file in the General Land Office, disclose that prior to 1879 the ninety-ninth and one hundred and third degrees of longitude west of Greenwich were considered as being identical with the twenty-second and twenty-sixth -degrees of longitude west of Washington, respectively. It appears that all meridians were placed on said maps on the assumption that the Meridian of Washington was located 77° west of Greenwich, whereas its true location, as shown by “U. S. Geological Survey Bulletin No. 817, second edition, 1930,” page 206, is 77°3'2.3" west of Greenwich.
On the map of 1879 of the Territory of Dakota (Map No. 10, Territory of Dakota, sheet 2, a record of the General Land Office) the ninety-ninth degree of longitude west of Greemvich was placed on the true location •of the twenty-second degree of longitude west of Washington, but the twenty-second degree of longitude west of Washington was placed to the west of its true loca *400 tion. However, beginning with the year 1882, on ail maps of the General Land. Office, meridians of west longitude, or meridians west of Greenwich, were placed ón their true locations. For the purpose of this report, those tracts of land falling between the boundaries defined in terms of degrees of west longitude as located on maps of the Territory of Dakota prior to 1882 and the boundaries as located on maps of said territory subsequent to 1882, are designated as “alternate tracts,” the area of which should be excluded from, or included within, the boundaries defined by the Treaty of April 29,1868,15 Stat. 635, the Executive order of January 11, 1875, 1 Kappler 898, the act of February 28, 187†, 19 Stat. 254, the Executive order of August 9,1879, 1 Kap-pler 899, the Executive order of March 20, 1884, 1 Kappler 884, and the aforesaid act of March 2, 1889, according to whether the location of meridians as set out on maps of the Territory of Dakota prior to 1882, or subsequent to 1882, is used.
To some extent the General Accounting Office, and to a greater extent plaintiff’s counsel, in reliance upon and elaboration of that office’s report, seem to have fallen into historical error. L’Enfant’s plan shows that he proposed two different locations for zero meridians for Washington, neither of which passed through the White House. The plan shows a square about a mile east of the Capitol, and a marginal reference to the square which says •
B. An historic Column, also intended for a Mile or itinerary Column, from whose station (a mile from the Federal house) all distances of places through the Continent are to be calculated.[3]
On the plan L’Enf ant also marked the longitude of the “Congress House” as zero. The plan does not indicate that its draftsman was computing these locations in any relation to meridians west from Greenwich, or any other point. It was customary at- this time for each nation to measure from its own meridian, usually one through its capital. This custom persisted until 1884 when an international conference, called by the President of the United States pursuant to a *401 Joint Resolution of Congress of 1882, agreed upon the use of the meridian of the Royal Observatory at Greenwich England.[4] As we shall see, measurement from Greenwich began to be practiced in this country earlier than 1882.
Pursuant to the L’Enfant plan, one Andrew Ellicott laid out the streets, avenues, and reservations of the City of Washington in 1792, drawing a meridian through the Capitol Building site.[5] Not until 1804 ivas the White House meridian located. In that year a surveyor named Nicholas King, under the direction of Mr. Brigg, perhaps at the request of President Jefferson, located a meridian from the center of the front door of the White House, and marked its location on the hill north of the White House on Sixteenth Street, and its intersection with a line due west from the Capitol, near where the Washington Monument now stands.[6] There was no indication that anyone supposed that the center of the front door of the White House happened to lie exactly on meridian 77° west of Greenwich, or in any other particular relation to that meridian.
None of these Washington meridians seem to have been used in the description of boundaries of territories until after 1850. The descriptions named meridians west of Greenwich. In 1850 the meridian of the old Naval Observatory located at 24th Street Northwest near Constitution Avenue was established by Act of Congress as the zero American meridian for astronomical purposes, while the Greenwich meridian was directed to be used for nautical purposes (9 Stat. 513, 515). This observatory was about half a mile southwest of the White House and its location ivas established as early as 1845 as '¡T°339.6" west of Greenwich,[7] which location was not far from correct, though it must have been established *402 by the comparison of mariners’ chronometers, as the Atlantic Cable had not yet been laid.
■ In 1864, Montana (13 Stat. 85, 86), and in 1868 Wyoming (15 Stat. 178) were carved out of the old Dakota territory, by descriptions fixing their eastern boundaries as 27° west of Washington. The date of the Wyoming statute is July 25, 1868. On April 29, 1868 and thereafter a treaty was negotiated with the several tribes of the Sioux diminishing their reservation and fixing the western boundary of it at meridian 104° west from Greenwich (15 Stat. 635). This treaty, it will be observed, fixed the western boundary of the new' Sioux reservation at meridian 104°, the true location of which was 3'2.3" or some two and one-half miles east of the new western boundary of Dakota Territory, which was to be fixed by statute enacted three months later and before the treaty was ratified. The result, unless meridians 27° and 104° were regarded as identical, was to leave inside the Territory of Dakota but west of the Sioux reservation a long, narrow, inaccessible strip along the whole Western boundary of what is now South Dakota,' difficult to govern and equally difficult to rationalize. Plaintiff urges this situation as proof that, at this time, the Government assumed as a fact that meridian 27° west from Washington coincided with 104° west from Greenwich. Plaintiff further points out that in 1875 when the Allison Commission was appointed to confer with the Sioux to negotiate a cession of the Black Hills country to the United States, the Commissioner of Indian Affairs, in his instruction to the Treaty Commissioners wrote:
That portion of the Black Hills country which lies within the boundaries of Dakota is, without dispute, a part of their permanent reservation.
Phis statement means -that the Commissioner of Indian Affairs thought that the western boundary of the then Sioux reservation coincided with the western boundary of Dakota.
.' These circumstances point strongly to the fact that there was confusion or carelessness on the part of those in, the Government dealing with Indian affairs about these boundaries,; and that what one part of the Government, the Naval Observatory, knew very well, another agency of the Government having to do with Indian affairs overlooked. But *403 our question here is not whether meridian 104° west of Greenwich, as named in the treaty of 1868, coincided with meridian 27° west of Washington, fixed as the western boundr ary of Dakota by the 1868 statute creating the territory of Wyoming. It is whether meridian 103°, named in the agreement and statute of 1877 as the new western boundary of the new and further-diminished Sioux reservation coincided with meridian 26° west of Washington in the mind of Congress in 1877. No mention of 26° west of Washington occurred in any contemporaneous treaty or statute. There was nt> mark or line on the ground at 26°. Did meridian 103° as named in the agreement of 1877 mean 26° west of Washington because meridian 104° meant, and we assume for the purpose of this discussion that it did mean, 27° west of Washington when it was named nine years before ? We think not.
Let,us first assume thsit meridian 103° as named in 1877’ was a- pure abstraction. Before its meaning on the ground could be determined, there would have to be a fixing of itb location by astronomical means and time computation. The art and the knowledge necessary to do that were fully available/., : This abstract line, then, when it should be reduced to reality, would be on the true line of meridian 103° and there would, be no probability, barring mechanical errors, of its being somewhere else. There is no showing of any dominant purpose on the part of Congress to take from the Indians, in 1877,; exactly one degree of longitude. The purpose was tó acquire the Black Hills and their gold. It was seen that the approximate location of meridian 103° would accomplish this purpose, as well as giving convenient access to the gold,- /This location was not intended to be contingent upion ihe location of some other line fifty-five miles away. And some.confusion in the mind of the Commissioner of Indian Affairs as to identity of meridians in general, if such cork fusion .existed, would not be sufficient to change the apv-parently plain meaning of the language of Congress. It 'should be noted that the Commissioner’s* mistake, disclosed by his instructions to the Treaty Commissioners quoted above, may have resulted from his being unaware that the Wyoming statute and the Sioux Treaty, both of 1868, did not name the same meridians.
*404 In what we have said we have assumed that Congress in 1877 named meridian 103° as a mere abstraction, to be located on the ground at some later time. In fact Congress had available in 1877 a good deal of information as to where meridian 103° actually lay. In 1875 a party known as the Jenney Expedition had been sent to investigate the Black Hills, in view of the discovery of gold there. A topographer and an astronomer were added to the party. The astronomer, by astronomical observations, located more than seventy distinct points of longitude measured from Greenwich, and came out with material for making a map.[8] Such a map was made, showing the principal natural objects and their location with reference to Greenwich meridians.[9]
In the meantime, also beginning in 1875, a commission was appointed by the Secretary of the Interior, at the direction of the President, to negotiate with the Sioux about the relinquishment of the lands.[10] Senator Allison of Iowa was Chairman of the Commission. In March 1876 Senator Allison introduced a bill in the Senate providing for the negotiation of an agreement with the Sioux for a part of their reservation. The bill ivas referred to the Committee on Indian Affairs of which Senator Allison was Chairman.[11] April 18, 1876, Senator Allison submitted and the Senate adopted a resolution calling upon the Secretary of the Interior for the. report of the Jenney Expedition. As much of the report as was ready was submitted, with a preliminary map showing, as we have said, locations with relation to meridian 103°.[12] This report was received by the Senate and printed for the use of the members.[13]
Senator Allison’s bill did not pass, but the Senate Committee on Appropriations, of which Senator Allison was a member, amended a House bill making appropriations for the Indians, so as to require that the Sioux, in order to receive more than half the money appropriated for them, must *405 agree to relinquish that part of their reservation lying west ox meridian 103°.[14] This amendment, in substance, was accepted in conference.[15] A commission was appointed which negotiated an agreement with the Sioux and reported back December 18,1876. A bill to ratify it was introduced in the Senate.[16]
On January 16, 1877, the Secretary of the Interior transmitted to Senator Allison, Chairman of the Committee on Indian Affairs, the final report of the Black Hills expedition of 1875, together with plates, maps, and illustrations, and a request of Professor Jenney that they be published.[17] A similar communication and request was sent to the Speaker of the House, where it was referred to the Committee on Indian Affairs and ordered printed.[18]
The map transmitted in 1877, like the 1875 preliminary map, showed the meridians west of Greenwich including meridian 103° in relation to mountains, rivers, valleys, and other natural objects. On January 26,1877, Senator Allison introduced, at the instruction of the Committee on Indian Affairs, the bill to ratify the negotiated agreement.[19] This bill became the Act of February 28, 1877 (19 Stat. 254), whose interpretation is here in question.
In this condition of the record, we cannot say that Congress did not mean what it said when it named meridian 103°. To give the words the meaning urged by plaintiff would shift the line to the west, in contradiction to its location on the map which Congress had before it for consideration, and throw the line out of relation to the natural objects shown on that map.
Plaintiff argues that the administrative construction put upon the 1877 agreement is in accord with plaintiff’s contention. It says that the lands within the narrow strip, which, according to the view which we take, were relinquished by plaintiff in 1877 and thereby became a part of the public *406 lands and open for settlement as such, were not in fact treated as a part of the public lands until after the agreement of 1889, which, of course, relinquished them if they had not been relinquished in 1877. Thus, plaintiff says, the Government showed that it interpreted the 1877 agreement as plaintiff urges us to interpret it.
It is true that none of these lands within the strip were entered before 1889, or, in fact, before 1893. But they seem not to have been surveyed and platted for such entry until 1892, and hence could not have been so entered. Plaintiff urges that the Comptroller General’s report in this case shows that when these lands were entered, subsequent to 1893, they were entered under the Act of 1889, i. e., as lands formerly of plaintiff, and not as ordinary public lands. The Comptroller General’s report seems to indicate the contrary. That report seems to distinguish between the lands within the strip which it says were sold as “public lands” and the lands clearly derived from plaintiff which it says were sold “under Section 21 of the Act of March 2, 1889.”
We think plaintiff has not shown an administrative construction of the Act of 1877 which would vary the normal meaning of its words.
We conclude, therefore, that as to the 271,482.57 acres of land within the strip, the defendant is not accountable. The defendant is, however, accountable for $5,307,655.87, the proceeds of the 9,261,592.62 acres of land here involved,' and lying east of the true line of meridian 103° west of Greenwich. The defendant’s motion for a new trial is granted, the former findings of fact, conclusion of law, and opinion are withdrawn. The foregoing findings of fact, conclusion of law, and opinion are substituted for those withdrawn.
The case is remanded to the General Docket for further proceedings in accordance with this opinion. It is • so ordered.
JoNes, Judge; Whitakee, Judge; LittletoN, Judge; and Wiialet, Chief Justice, concur.

 Note 1, ante.

 Manual of Origin and Development of Washington, Senate Doc. 178. A facsimile of tile plan and a typed transcription of the notes inscribed thereon appear at pp. 26-27, Sen; Doc. 17S, 75th Cong-., 8d sess., Cong. Doc. Series No. 10242.

 “American Prime Meridians,” by Joseph Hyde Pratt, of U. S. Geological Survey, Geographical Review, April 1942, Def. Ex. L; “Surveys and maps of the District of Columbia,” by Marcus Baker, The National Geographic Magazine, vol. 6, January 1894, to May 1895, pp. 149, 169, Def. Ex. K; “Meridians of Washington,” by Frank L. Culley, Geodetic Letter No. 1, vol. 3, March 1936, p. 56, published by Division of Geodesy, U. S. Coast and Geodetic Survey, Def. Ex. J.

 Op. cit. note 3 ante, pp. 30 — 31.

 Op. cit. note 4 ante.

 See Defendant’s Exhibit M, a letter from J. F. Hellweg, Captain, U. S. N. (Ret.), Superintendent of the TJ. S. Naval Observatory, citing the first volume of the Observatory publications, that for 1845.

 Newton & Jenney, Geology of the Black Hills of Dakota, U. S. Geog. & Geol. Survey, 1880, pp. 18-19.

 Sen. Ex. Doc. 51, 44th Cong., 1st sess., Cong. Doc. Series 1664.

 Report, Commissioner Indian Affairs, 1875, p. 184.

 Cong. Rec., 44th Cong., 1st sess., p. 1662.

 Sen. Ex. Doc.' 51, 44th Cong., 1st sess., Cong. Doc. Series 1664.

 Cong. Rec., 44th Cong., 1st sess., pp. 2709, 2729.

 Cong. Ree., 44th Cong., 1st sess., p. 3902.

 Id., p. 5306.

 Cong. Rec., 44th Cong., 2d sess., p. 983.

 Sen. Misc. Doc. 41, 44th Cong., 2d sess., Vol. 1, Cong. Doc. Series No. 1722.

 Cong. Rec., 44th Cong., 2d sess., p. 707.

 Senate Bill 1185, Cong. Iiec., 44th Cong., 2d sess., p. 983.