The MINNESOTA CHIPPEWA TRIBE, et al., The Red Lake Band, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 19, 189–A.

United States Claims Court.

Dec. 23, 1987.

Marvin J. Sonosky, Washington, D.C., attorney for plaintiffs. Anne D. Noto, Silver Spring, Md., and Rodney J. Edwards, Duluth, Minn., of counsel.

Pamela S. West, with whom were Laura R. Ouverson and Harry H. Kelso, Washington, D.C., for defendant.

## ORDER

BRUGGINK, Judge.

Pursuant to the order of November 25, 1987, as amended, trial is set to commence April 4, 1988 on certain claims presented in docket number 189–A. Generally stated, that docket relates to an accounting by defendant of Red Lake Band trust funds. It is part of a larger complex of claims presented in these consolidated cases, all arising under the Indian Claims Commission Act, Pub.L. No. 79–726, 60 Stat. 1049, 25 U.S.C. §§ 70a–70v–2 (1976). Most of the issues raised by the Red Lake Band have counterparts in the Minnesota Chippewa Tribe docket numbers. In hopes of using a resolution of the present claims to settle similar Minnesota Chippewa claims, trial on the Red Lake disbursement accounting has been scheduled earlier. One additional matter is also scheduled for trial—whether monies in excess of 5% of the principal trust fund were improperly expended. While the court views a ruling on the question as controlling for all bands, and while that issue is not directly related to the disbursements accounting, an early resolution in this context is called for, since it could potentially make a fact-intensive re-

view of the disbursement accountings unnecessary.

In an effort to focus the issues to be tried, and to resolve contested procedural or substantive issues, the parties have engaged in extensive pretrial briefing. Oral argument was held November 23, 1987. While several issues raised by the briefing and other pretrial materials cannot be fully or even partially resolved without hearing the evidence, the purpose of this order is to give guidance where possible in advance of trial.

### A. Background

A review of the procedural history of this legal saga is set out in *Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 221 (1986). For purposes of evaluating the context of the Red Lake Band accounting, however, the court will briefly recap the genesis of particular claims to be tried beginning in April.

In 1951, the Band filed docket number 189 before the Indian Claims Commission ("ICC"). In that petition, the Band asked, among other relief, for an accounting of all money belonging to plaintiff that the Government administered, and payment for damages stemming from the violation of plaintiff's rights. Subsequent to an order granting a motion to sever, plaintiff filed docket number 189–A in 1956. That complaint asked for an accounting of all 1889 Nelson Act[1] trust funds and judgment for the amount shown to be due upon the accounting, plus any further relief the ICC found just and equitable. In 1963, the Government Accounting Office ("GAO") issued a report detailing expenditures made on behalf of the various Chippewa bands, including Red Lake. In response to this report, the Indians filed numerous exceptions. Red Lake's exceptions were filed in 1970.

Numbers 2 and 30 were plaintiff's general accounting exceptions. Paraphrased, these exceptions made the following claims: failure to disburse Chippewa monies in accordance with the 1889 Act; failure to properly account for tribal funds in fulfill-

---

1. Act of Jan. 14, 1889, ch. 24, 25 Stat. 642.

ment of the United States' obligations under Section 7 of the 1889 Act and its trustee position; failure to furnish adequate information; and failure to expend funds in accordance with law and standards applicable to the trustee-fiduciary relationship. Plaintiff specifically sought in exceptions 2 and 30 a fuller accounting, asserting that the GAO report was inadequate.[2]

By order of July 2, 1984, defendant was directed to prepare separate supplemental accountings of amounts paid for the benefit of the Indians on a band-by-band basis. That order was vacated in *Minnesota Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338 (Fed.Cir.1985). In that decision, the court of appeals permitted the band-specific accounting to proceed only with respect to Red Lake, because that band had "clearly set forth in exceptions 1–40 its demand for a separate accounting of Nelson Act Funds...." *Id.* at 342. The supplemental accounting as to other bands was to proceed without a band-by-band breakout.

Subsequent to that decision, this court has permitted defendant not to do the formal accounting of Nelson Act funds. Instead all the bands volunteered to accept from defendant the backup documents which would normally have formed the support for, or substance of, an accounting. This willingness was expressed by plaintiff at a November 12, 1985 conference to discuss scheduling for accounting tasks in docket numbers 19, 188, 189–A, 189–B, and 189–C. Transcript of proceedings, November 12, 1985 at 26. Plaintiff again expressed its willingness to accept the backup data for Nelson Act fund accountings in the January 8, 1986 proposed schedule of accounting tasks. Defendant completed delivery of these materials with respect to the Red Lake Band on August 1, 1986.

After review of the extensive Red Lake backup documents, plaintiff on February 25, 1987 filed "exceptions." In order to distinguish them from the pleading-type exceptions filed in 1970, and to credit the plaintiff's accountant, who was primarily responsible for drafting them, they will be referred to as the "Gillis exceptions."

Of approximately $4,000,000 in expenditures covered by the Red Lake disbursements backup documents, plaintiff has challenged over 98% in its February 25 filing. The basis for a challenge as to each expenditure is expressed by a numerical code referencing one of 23 Gillis exceptions. Only 13 of the Gillis exceptions have been asserted against the Red Lake disbursements: (1) no proof; (2) failure of proof; (3) the purpose of the expenditure not shown either explicitly or by reference to the unit (agency, school, tribal, individual) receiving the expenditure; (4) no proof that the Red Lake Band is the beneficiary; (5) the proffered proof of expenditure does not comply with the applicable law and regulations; (6) duplication—same charge more than once; (7) the expenditure was not for the exclusive benefit of the Red Lake Band; (8) the expenditure was not authorized by the 1889 Act; (9) the expenditure was for a federal governmental purpose; (10) the expenditure was for individual benefit; (11) the expenditure was not beneficial to the band; (12) the expenditure was in violation of federal law and the Constitution of the United States; and (13) the expenditure was for "food, rations, or provisions" (barred by the 1974 amendment to the Indian Claims Commission Act, *see* 25 U.S.C. § 70a (1976)).

Plaintiff subsequently submitted a further explanation of the Gillis exceptions on September 9, 1987.[3] Defendant filed its

---

2. An additional exception relevant with respect to defendant's assertion of the statute of limitations is number 5. In it, the Red Lake Band challenges expenditure of interest bearing funds (*i.e.,* the trust corpus) at a time when there were monies available in the non-interest bearing fund (*i.e.,* accumulated interest). The parties refer to this as the "reverse spending claim." *See infra* p. 126.

3. In the September 9 explanation, plaintiff asserted that certain Gillis exceptions, provided to defendant but not actually utilized in the February 25 filing, were incorporated in the exception "The expenditures were not for the exclusive benefit of the Red Lake Band." The assertedly incorporated exceptions were (1) expenditure unreasonable for the services provided, and (2) expenditure was not used for education.

response to the exceptions, as explained, on October 23, 1987. Unfortunately, the exception-response process has thus far resulted in no agreement concerning which disbursements were actually and properly made. Almost every Red Lake disbursement remains at issue. Because the court was informed that trial of these disbursements would involve examination of 90,000 or more pages of material from defendant alone, the court has worked, with the parties' cooperation, toward a methodology to avoid legal gridlock. The result, after numerous modifications and conferences, is the order of November 25, 1987, that includes the use of trial by sampling of the more fact-intensive Gillis exceptions.[4] Hopefully it provides a practical, if not entirely pedigreed, solution. Still unresolved, however, is who does what, and when?[5]

B. Burden of Proof, Offsets, and Other Procedural Matters Related to the Disbursement Accounting

The primary remaining procedural matter relates to burden of proof. As the following discussion reflects, however, an examination of that question requires resolution of two related matters—proof with respect to presumptively improper expenditures, and the issue of whether the upcoming trial will address defendant's entitlement to claim the disbursed funds as offsets.

1. Burden of Proof In Accountings

The court starts with the general proposition that the burden of proof normally rests with the plaintiff. The same is true in Indian claims cases. See *Yankton Sioux Tribe v. United States*, 224 Ct.Cl. 62, 102, 623 F.2d

159, 179 (1980); *Chickasaw Nation v. United States*, 103 Ct.Cl. 1, 35, *rev'd on other grounds*, 326 U.S. 217, 66 S.Ct. 84, 90 L.Ed. 25 (1945). As will be seen, however, despite the general applicability of that principle to most Indian claims, with respect to the primary matter presently set for trial—accounting for disbursements as to the Red Lake Band—two additional considerations affect the result.

The first is the well-established rule that the Government has the burden of doing a proper accounting in these actions. *Sioux Tribe of Indians v. United States*, 105 Ct.Cl. 725, 802, 64 F.Supp. 312, 331 (1946), *vacated and remanded per curiam*, 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1946), *on remand*, 112 Ct.Cl. 50, 78 F.Supp. 793 (1948) (affirming and reentering 1946 Court of Claims opinion), *cert. denied*, 337 U.S. 908, 69 S.Ct. 1046, 93 L.Ed. 1720 (1949). While both sides agree on that principle, thereafter they part company. Plaintiff contends that defendant must go first at trial, and while plaintiff must challenge specific disbursements, the court must ultimately find for it to the extent any disbursements have not been affirmatively demonstrated to be proper. Defendant contends that plaintiff has the ultimate burden of proof and must go first, a pattern which it says was consistently followed in ICC cases. It moreover draws a distinction between the ultimate burden of proof on the petition—which it assigns to plaintiff—and its own obligation to do an accounting. Defendant contends that "this burden of making a proper accounting does not become the responsibility of the defendant until the plaintiff has made a *prima facie* case and has shown by a preponderance of the evidence that an expenditure is

---

4. After reviewing defendant's Notice of Filing Statistical Sampling, the court iterates that while the parties are welcome to verify their separate sampling techniques so as to enable them to come to a settlement, the only expenditures the court will rule on are those actually sampled. In hopes that a complete resolution can be achieved by a subsequent settlement, however, defendant is directed herein to put into evidence supporting backup data for *all* expenditures for purposes of developing a full record.

5. At least part of the "how?" can be quickly resolved. By order of November 1, 1985, Appendix G RUSCC does not apply to these proceedings. *See also* order of October 2, 1987. In fulfilling the extensive pretrial requirements described in the November 25 order, however, the court expects the parties to continue to adhere to the principles of cooperation, communication and voluntary discovery which are the essence of Appendix G. The rules of the United States Claims Court will otherwise apply, as will the Federal Rules of Evidence.

improper." Defendant's Response Brief of Nov. 17, 1987, at 3.

The court's review of the decisions relied on by the parties and other precedent suggests that there is a wide assortment of results and analyses to choose from. However, the court concludes that defendant's position is incorrect insofar as the accounting for disbursements is concerned. Nevertheless, a review of the practice of the ICC and the decisions of this court and its predecessor court suggests that the parties' differences can be largely reconciled in a manner that is fair to both sides.

*In Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 85 (1973), the ICC recites:

> The burden is on the defendant to make a proper accounting. Thus, for a particular item to be exceptionable, the test is not whether the report shows it to be improper; it is enough if the report fails affirmatively to show that it was proper. When the plaintiff makes his exception, it then becomes incumbent upon the Government to satisfy the Commission as to the legality of the challenged item.

In a later decision in the same litigation the ICC states, "The defendant's duty in accounting cases is to reveal what it did with the plaintiff's money." 34 Ind.Cl.Comm. 122, 144 (1974).

██ The way in which that obligation has been implemented, at least at the pleading stage, was set out in *Sioux Tribe v. United States*, 12 Ind.Cl.Comm. 541 (1963). There the ICC directed the following practice upon filing of a petition seeking an accounting:

> It is the opinion of this Commission that the desirable procedure to be followed in these accounting cases consists of the filing of the General Accounting Office report by defendant in pursuance of the petition along with such appropriate motion as defendant may see fit under the circumstances. Petitioner will then file in writing within ninety (90) days its specific exceptions, if any, along

with its reasons therefor, to any item or items which it contends are in violation of a proper accounting and which should be disallowed. Defendant will file an answer within the usual time. The parties will then be at issue and may proceed to a hearing on the matter. This is the procedure apparently favored by the Commission in prior cases where the problem has arisen although it has never been set forth in its entirety.

*Id.* at 547. The ICC cites as support a decision by the Court of Claims in *Sioux Tribe of Indians v. United States*, 97 Ct.Cl. 391, 397 (1942). Reliance on that precedent, however, creates some ambiguities as to burden of proof. The court there, in rejecting a claim by plaintiffs that they were entitled to a judgment based solely on the obligation of defendant to account for monies received from the sale of lands, stated:

> [T]hat fact, in itself, does not create even a *prima facie* liability on the part of the defendant in this suit....
>
> ... Plaintiff does not make out its case until it shows that the defendant has failed to set up the fund, or, having set it up, has failed to use it in accordance with the agreement. Before we can decide whether the contract has been breached, plaintiff must show that the General Accounting Office report is wrong, or that the disposition of the funds as there shown was not in accord with the agreement.

*Id.* at 397. The ICC appeared to recognize this tension in the precedent:

> The contention of petitioners that it is defendant's duty to prove that these expenditures were legal and proper may be applicable, but at a later stage.... The burden of proof is a matter which has concerned many legal writers and appears to be resolved primarily on the basis of what experience has shown to be fair under a specific situation. There seems to be no single rule which can cover all the situations that may arise.

*Sioux Tribe*, 12 Ind.Cl.Comm. at 548.[6] The more recent decision of the Court of Claims

---

6. With respect to trial procedure, the decision

merely states, "Upon the filing of the answer by

in *American Indians Residing on Maricopa–Ak Chin Res. v. United States*, 229 Ct.Cl. 167, 667 F.2d 980 (1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed. 2d 1284 (1982), discusses the ICC procedures, and seems to suggest that the initial burden lies with defendant:

> The parties have pursued the procedure promulgated by the Commission for preparation of a general accounting claim. This procedure *shifts the burden of going forward to plaintiff* without regard to the inadequacy of the initial GSA report. Where, however, plaintiff has sufficient information about an item to challenge it, the defendant (when ordered) comes forward with additional information in order to discharge its obligation as to the item's propriety.

*Id.* at 202, 667 F.2d at 1002 (footnote omitted) (emphasis added). The court views this as support for plaintiff's position that the initial and final obligation are defendant's—to demonstrate the propriety of the disbursements. The *quantum* of evidence required of defendant at the two stages, however, can vary. At the outset, defendant can meet its obligation by tendering an accounting. If the plaintiff challenges a disbursement with evidence to show that the expenditure was improper, or points to expenditures improper on their face, plaintiff has met its burden of going forward with the evidence. In that instance, defendant can no longer rely exclusively on the GAO report.

■ In summary of this first point, the court holds that defendant has the obligation to present the Indians with a proper

accounting. How that burden expresses itself at the pretrial stage through the filing of a petition, accounting report, exceptions, and response is well-settled. With the exception that the accounting in this case consisted in part of a production of documents, that procedure was followed here. Although the precise application to burdens of proof at trial is less than clear, the court believes that by having the trial mirror the pretrial process—namely, defendant goes first by offering into evidence the GAO report and all backup materials; plaintiff then offers evidence to support its exceptions; defendant responds to the exceptions—the appropriate balance is struck.

### 2. Presumptively Improper Disbursements

■ There is a second reason why the present case is different from the typical one, requiring that the burden of proof (in the sense of a risk of nonpersuasion) not be assigned simply to plaintiff. There are matters of proof in an Indian claims context that traditionally are seen as defendant's primary obligations. Two of these are implicated in this action. The first concerns expenditures that are for two or more purposes, one of which is improper. When that is the case, as for instance when an expenditure is partly for a government agency's benefit and partly for tribal benefit, defendant bears the burden of providing some method of distinguishing the proper from the improper. *See Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 336, 385 n. 42 (1986), and cases cited therein.[7]

---

defendant the matter may then proceed to a hearing on its merits.... At such a hearing petitioner and defendant will have an opportunity to examine any witness with regard to the accounting report." 12 Ind.Cl.Comm. at 550.

7. In *Sioux Tribe*, 105 Ct.Cl. at 797, 64 F.Supp. at 329, the Court of Claims makes the observation that

> In these circumstances the burden is on the Government, since the agencies are primarily its obligation, to satisfactorily show, if such be the fact, what portion of the total expenses of the agencies should not be assumed by it and be charged to the Indians as disbursements in payment of obligations of the Indi-

ans. We have no such proof in these cases. On the other hand plaintiff Indians in these cases have made out a *prima facie* case and have shown by a preponderance of the evidence that the agency expenses here in question represented obligations of the Government....

Not surprisingly, both parties rely on this language to support their positions on burden of proof. While the first and last sentences appear somewhat inconsistent, the court believes that they are compatible in these types of cases if plaintiff's burden is seen as a burden of going forward with the evidence once the defendant puts on its accounting.

## 3. Offsets

Another area in which defendant has the burden of proof is the matter of offsets. Under Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976), in determining the quantum of relief, appropriate deductions are to be made for all "payments by the United States on the claim, and for all other offsets." In the normal pattern offsets are determined after plaintiff establishes the initial quantum of its judgment. Part of the confusion[8] in this case stems from the fact that the parties, with the court's approval, proposed conducting trial on the Red Lake disbursement accounting before trial on the land and timber valuation portions of docket numbers 19 and 189–A. In the cases reviewed by the court, the disbursement accounting either came after an initial determination of the gross amount to which the Indians were entitled, or else the amount going into trust was apparently seen as the outer limit of liability. Determination of whether a particular expenditure advanced by defendant as a payment on the claim is disallowable would then take place after the amount of the gross award was known. *See, e.g., Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 190, 624 F.2d 981, 991 (1980); *Miami Tribe of Oklahoma v. United States*, 222 Ct.Cl. 242, 246 n. 4, 614 F.2d 1273, 1275 n. 4, *cert. denied*, 449 U.S. 822, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *Sioux Nation of Indians v. United States*, 220 Ct.Cl. 442, 453 n. 4, 601 F.2d 1157, 1163, n. 4 (1979). *Compare Menominee Tribe of Indians v. United States*, 101 Ct.Cl. 22 (1944) *with Menominee Tribe of Indians v. United States*, 118 Ct.Cl. 290, *appeal dismissed*, 342 U.S. 801, 72 S.Ct. 91, 96 L.Ed. 607, *vacated* 119 Ct.Cl. 832 (1951). Sometimes the issues are determined simultaneously. *See Sioux Tribe of Indians v. United States*, 105 Ct.Cl. 725, 64 F.Supp. 312 (1946); *Assiniboine Indian Tribe v. United States*, 77 Ct.Cl. 347 (1933).

In the present case, defendant has indicated its opposition to treatment of the disbursements trial as an offsets trial, saying that would be premature. In a sense that is correct. Plaintiff has not established the gross amount to which it is entitled. Even if it were determined that some disbursements were improper, the larger question would remain of whether the land and timber of both the Red Lake Band and Minnesota Chippewa should have been sold at higher prices.[9] Nevertheless, as an irreducible minimum, the Government must account for its handling of those funds that were actually received into trust regardless of how much more perhaps should have been received. Moreover, to be able at a later date in the litigation to claim that it is entitled to credit those disbursements as payments on the claim, the Government must show that those particular trust funds were properly disbursed, i.e., that they were beneficial to the tribe, and were not for food, rations, or provisions. *See* 25 U.S.C. § 70a (1976).

While it is true that proper disbursements are by no means the limit of payments on the claim or other offsets, the court's review of applicable cases leads it to conclude that—to the extent the inquiry is focused on monies actually received into trust—the test of allowability is fundamentally the same.[10] If the validity of these

---

8. The court notes that cases referred to by defendant as supporting plaintiff's burden of proof, but in the context of a motion for summary judgment, are an additional source of confusion. *See, e.g., Three Affiliated Tribes of Fort Berthold Reservation v. United States*, 39 Ind.Cl. Comm. 446, 468 (1977); *Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 104 (1973). Those references are inapposite, since the moving party bears the burden on summary judgment.

9. The court recognizes that there are numerous other affirmative claims that could add to the overall size of the recovery; this appears to be the largest however.

10. Defendant argues that offsets are to be considered, calculated, and determined following an award. It cites for that proposition *Miami Tribe of Oklahoma v. United States*, 222 Ct.Cl. 242, 246, 614 F.2d 1273, 1275 (1980), and *Sioux Nation of Indians v. United States*, 220 Ct.Cl. 442, 453, 601 F.2d 1157, 1163 (1979). The court finds those references inapposite to the precise issue here. The narrow question there was whether expenditures that might not be allowable as offsets could nevertheless be taken into

disbursements as offsets is not considered contemporaneously with the accounting, the upcoming effort will be duplicated in a later consideration of offsets, because in large measure the validity of an offset with respect to expenditures from Indian funds, as opposed to gratuities, is the same question resolved in an accounting of the propriety of disbursements. If, for example, the court found that certain funds were not properly accounted for because monies were spent on Government obligations, or because of a lack of documentation, the defendant would not be able to offset those expenditures as payments on the claim. The former finding would be dispositive of the latter. The court concludes, therefore, that the substantive tests for allowability of payments on the claim will be tried as part of the disbursements trial. To hold otherwise would mean that identical documentary evidence would be reviewed twice for substantially the same purpose by the same court.[11] Considering the amount of material to be reviewed, even on a sampling basis, that bifurcated procedure would be extremely wasteful. If the court finds that a disbursement was proper and allowable and does not constitute food, rations, or provisions, it could be asserted later as a payment on the claim. Other amounts claimed as offsets would also be considered at that time.

Having concluded that it is appropriate to review the issue of whether these disbursements can be claimed as offsets, the evidentiary implication also has to be considered, namely that it is defendant's burden to show its entitlement to those offsets. *United States v. Seminole Nation,* 146 Ct.Cl. 171, 184, 173 F.Supp. 784, 793 (1959); *United States v. Kiowa, Comanche, and Apache Tribes,* 143 Ct.Cl. 534, 543, 163 F.Supp. 603, 609, *on reconsideration,* 143 Ct.Cl. 545, 166 F.Supp. 939 (1958), *cert. denied,* 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959); *see Menominee Tribe,* 118 Ct.Cl. at 326–27 (1951); *Sioux Tribe,* 105 Ct.Cl. at 802, 64 F.Supp. at 331. In *Sioux Tribe of Indians v. United States,* 105 Ct.Cl. 725, 64 F.Supp. 312 (1946), the court addressed at length the question of whether certain expenses that appeared to be for agency purposes were in fact for the benefit of the Sioux, and could thus be treated as offsets. After reviewing historical evidence of the origin of the Indian agency structure, the court held:

> [I]n view of the fact that primarily the agencies and their necessary expenses are obligations of the Government, the Government must prove by satisfactory evidence what portion, if any, of the salaries and expenses of such agencies should be charged against the funds or property of the particular Indian tribe concerned when it seeks to sustain its right to make such charges against Indian funds or to set up and claim such expenditures as offsets against an amount due the Indians concerned.

*Id.* at 788, 64 F.Supp. at 324.[12]

It is obvious therefore that under some circumstances, defendant already has the burden of proof. It has to prove its offsets, and it has to prove as to ambiguous expenditures the portion that is allowable. Moreover, in a larger sense the disbursements trial is the way for defendant to present its accounting for handling of

---

account to determine whether the tribes received unconscionable consideration. They certainly do not stand for the proposition that *consideration* of the allowability of offsets can never be done simultaneously with a determination of whether those same expenditures were proper disbursements. The court agrees with defendant's analysis to the extent that the final calculation and offset cannot be addressed at this time.

**11.** The court has already directed the parties to be prepared to try the question of whether disbursements are disallowable as payments on the claim because they consist of "food, rations, or provisions." *See* Order of Nov. 25, 1987. Section 2 of the Indian Claims Commission Act was amended to provide that "expenditures for food, rations or provisions shall not be deemed payments on the claim." Pub.L. No. 93–494, 88 Stat. 1499, 1500 (1974). *See* 25 U.S.C. § 70a (1976). This test will be applied on a sampling basis.

**12.** The court recognizes that *Sioux Tribe* was a final accounting in the sense that the total amount of monies for which defendant had to account was known, and it was appropriate therefore to consider defendant's offsets and enter a final judgment.

those monies that it unquestionably received.

### 4. Procedure to be Followed In This Case

In light of these considerations, the court is of the view that the following procedures, presumptions, and allocations of burden of proof and burden of going forward with the evidence are fair and appropriate.

■■■ The ultimate burden of proving the allowability of a disbursement is on defendant. At trial, defendant will open. It will put into evidence the 1963 GAO report, along with all [13] backup documents for Red Lake disbursements. This, in conjunction with the fact that these same documents have been presented for scrutiny by plaintiff, will presumptively satisfy defendant's obligation of doing a proper accounting as to those funds. Plaintiff then has the burden of going forward with the evidence or argument to support the Gillis exceptions to the Red Lake disbursements, and the responsibility to put on its case-in-chief as to other claims.[14] With respect to those disbursements that are on their face improper, plaintiff may rest after pointing out such disbursements.[15] With respect to those disbursements that are not on their face improper, plaintiff must put on sufficient evidence of disallowability to shift back to defendant the burden of going forward with the evidence.

■■ ■■ In determining whether a disbursement was proper, and hence ultimately allowable as a payment on the claim, the court will determine whether the disbursement was legally chargeable against Indian trust funds. Expenditures for obligations of the United States may not be charged against trust funds, nor may expenditures that are otherwise not in compliance with applicable laws or treaties. Expenditures

must have been for the benefit of the tribal entity.[16] To the extent sampled, disbursements will be categorized as to whether they were for food, rations, or provisions.

### C. Other Issues

■■ In addition to the disbursements accounting, one other claim will be tried during the trial set to begin in April 1988. That is the issue of whether any expenditures beyond 5% of the trust corpus are a breach of the Nelson Act or otherwise improper under the Indian Claims Commission Act. This is not a disbursement accounting matter, but is an independent, affirmative claim. It will require interpretation of a treaty and various statutes. The court views this claim as not directly tied to the production of backup documents or to defendant's obligation to account for how trust funds were spent. It is appropriate therefore to leave the ultimate burden of proof on this issue with plaintiff.

As discussed during oral argument, the questions of reverse spending and delay in deposit will not be tried as part of the disbursements trial. They are more appropriately taken up at a later date along with the receipts accounting.

### D. Statute of Limitations

Defendant asserts that the following exceptions raised by the Gillis codes or theories of recovery raised in Plaintiff's Memorandum of Law Summarizing Position on Legal Issues and Theories of Recovery for Disbursement Claims are new and barred by the applicable statute of limitations: (1) disbursements from the interest fund were improper; (2) trust funds were squandered or wasted; (3) payments for sectarian school tuition were improper; (4) payments for non-sectarian school tuition were improper; (5) the Indians received inferior

---

**13.** Although some of the Gillis exceptions, and the issue of food, rations, and provisions, are being tried on a partial basis only, defendant should introduce all backup materials.

**14.** *See infra* p. 15. Plaintiff has the burden of proof as to issues not directly related to the disbursement accounting.

**15.** If an expenditure is on its face improper, it will be disallowed, regardless of whether that fact is pointed out by plaintiff, assuming it otherwise comes to the court's attention and defendant is unable to demonstrate its propriety.

**16.** See *infra* pp. 127–28.

quality education; (6) the Indians received inferior quality medical care; (7) disbursements had to be for the exclusive benefit of the Red Lake Band; and (8) goods or services purchased were of no or little or no value.

If any of plaintiff's claims are barred by the statute of limitations, they are beyond this court's jurisdiction to adjudicate. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 272, 1 L.Ed.2d 306 (1957); *Mitchell v. United States*, 10 Cl.Ct. 63, 67 (1986). Claims brought under the Indian Claims Commission Act must have been filed by August 13, 1951. 25 U.S.C. § 70k (1976). While the statutory limitation itself must be strictly construed, *Navajo Tribe v. United States*, 220 Ct.Cl. 172, 174, 597 F.2d 1367, 1368–69 (1979), in determining whether or not a new claim "relates back" to an original pleading within the meaning of RUSCC 15(c), the court must determine whether the facts stated in the petition or exception provide sufficient notice to defendant that the original claim might be expanded. *See Minnesota Chippewa Tribe*, 768 F.2d at 340–41; *Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 534, 536–37 (1987). In making this determination, the requirement that a claim must have been asserted should be applied liberally to permit relation back if there is sufficient notice. *See Minnesota Chippewa Tribe*, 768 F.2d at 340; *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 585–89, 372 F.2d 951, 959–61 (1967) (construing rule 13(c) of the ICC, similar to RUSCC 15(c)).

Moreover, there is a special circumstance in the present case—the accounting. Once the request for a disbursement accounting is timely asserted, in deciding whether a particular claim was within the contemplation of the original petition or exceptions, the court has to recognize that theoretically the accounting may disclose matters of which the Indians were not aware. *Cf. Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 634, 373 F.2d 356, 358–59 (limitations period can be tolled if claim inherently unknowable), *cert. denied*, 389 U.S. 971,

88 S.Ct. 466, 19 L.Ed.2d 461 (1967). In determining when a plaintiff is "on inquiry" of its claims, the court focuses on whether facts known to plaintiff could reasonably have put plaintiff on notice of the claim. *Spevack v. United States*, 182 Ct.Cl. 884, 895, 390 F.2d 977, 984 (1968); *see Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984). In determining whether a particular challenge to a disbursement is embraced within the request for an accounting, as originally pleaded in the petition and exceptions, the court will be mindful of plaintiff's potential inability, if that be the case, to plead with greater specificity until it reviewed the backup documents.

Thus far, defendant has filed no motion to dismiss the issues identified in its discussion of the limitations question. It has merely raised the issue in its pretrial materials. Nevertheless, the court is prepared to address it in part.

With respect to defendant's argument that plaintiff's challenge to disbursements from the interest fund is barred, it is not entirely clear to the court whether defendant is referring to the interest bearing fund or the non-interest bearing fund. Defendant may be referring to the reverse spending claim, i.e., that money was spent from interest bearing funds when money was available in non-interest bearing funds. As indicated above, that issue was specifically raised in docket number 189–A as part of the 1970 exceptions to the GAO report. Exception 5 was captioned, "Reverse spending, use of interest bearing instead of non-interest bearing funds."

Assuming that defendant is challenging plaintiff's right to raise any claim for improper expenditures out of the interest fund (i.e., the non-interest bearing fund) such a claim also appears not to be barred. The original petition in docket number 189 requested that defendant account for "all funds received and expended by the United States under the provisions of the Nelson Act." The complaint also detailed the manner in which money could be disbursed from interest and principal funds according

to Section 7 of the Act, and alleged that money from both funds was not disbursed in accordance with the terms of the Act. Similarly, plaintiff's explanation in support of exception 2 to the 1963 GAO report stated that "the United States almost completely disregarded the 1889 Act-agreement with respect to the use and disbursement of the *funds....*" (Emphasis added). The exception thus applied to both the income producing and non-income producing funds.

In addition, the court believes the seventh issue challenged, that the disbursements had to be for the exclusive benefit of the Red Lake Band, is embraced in the Red Lake Band's request for a separate accounting. It is the law of this case that this band "clearly set forth in exceptions 1–40 its demand for a separate accounting of Nelson Act Funds and in exception 41 its claim for damages for 'failure to pay the Red Lake Band a share of the proceeds under the 1889 Act proportionate to the contribution of the Band.'" *Minnesota Chippewa Tribe,* 768 F.2d at 342. The question of whether the tribal entity benefited from those expenditures is an inherent part of determining whether the disbursements are allowable (or that they are proper offsets).[17]

With respect to the remaining issues, the court merely makes the following observations. First, the court understands the second claim challenged by defendant—that funds were squandered or wasted—to be merely a characterization of other claims rather than a separate claim for relief. The issue of whether the United States breached its obligations to plaintiff does not focus on a specific finding that the trust was "squandered or wasted." Second, the "claims" that defendant characterizes as relating to inferior quality education and medical care, as well as the Gillis exception to goods or services of little or no value, appear to the court at this point to be a logical outgrowth of the request for a disbursement accounting.

Finally, the court notes that the remaining claims (that payments to both sectarian and nonsectarian schools were allegedly improper) do not on their face appear to be covered by a reasonable construction of existing pleadings. Plaintiff will have an opportunity, however, to argue either that these matters are specifically raised by existing timely pleadings, or that they were generally raised earlier but could have been pleaded with specificity only after receipt of the backup documents. The court views a final ruling at this stage to be premature, particularly in view of the absence of a motion to dismiss.

The court directs the parties to be prepared to try all these matters, other than those relating to interest, including the question of when plaintiff's were or should have been on notice of them.

### E. What Is The Tribal Entity?

 It is clear that expenditures must have been for the benefit of the tribal entity, as opposed to the benefit of individual Indians, *United States v. Seminole Nation,* 146 Ct.Cl. at 183–84, 173 F.Supp. at 792, unless specifically allowed by treaty. *Creek Nation v. United States,* 43 Ind.Cl. Comm. 352, 364 (1978). Defendant takes the position that in determining whether disbursements benefited the tribal entity, that entity should be viewed as all the Minnesota Chippewa, not just the Red Lake Band. Whether plaintiff's claim that the Red Lake Band was not benefited is barred by the statute of limitations has already been discussed. It was noted that, unlike the other bands, Red Lake is entitled to a separate accounting. In explaining that entitlement, the Court of Appeals for the Federal Circuit held that "The effect of a band-by-band accounting would be to disallow offsets for payments made by the government to the Tribe unless proved to be made to a particular band." 768 F.2d at 340. The clear import of that statement is

---

17. The court's earlier holding that the "White Earth" allotments claim was barred, *Minnesota Chippewa Tribe,* 11 Cl.Ct. at 540, is readily distinguished. Unlike accounting related claims which might arguably be foreshadowed in the original petition and subsequent exceptions' requests for an accounting, the White Earth claim could not be directly tied to any previous pleading.

that, since Red Lake is receiving such an accounting, defendant must show that disbursements actually benefited that particular band.[18]

### F. The Government's Duties as Trustee

The parties are agreed that a trust relationship exists between the Chippewas of Minnesota and the United States. The trust exists, if for no other reason, by virtue of the Nelson Act, which creates a fund from monies generated by the sale of Indian lands and timber. Even in the absence of that language, however, a general trust relationship exists between the Indians and the Government. *Mitchell v. United States*, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). Moreover, a fiduciary relationship exists between the parties by virtue of defendant's management of Indian property. *Id.; see Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980).

While it is undisputed that a fiduciary relationship exists, it is also settled law that the trust enforced by the court in this case is not strictly a conventional one. In *Chippewa Indians of Minnesota v. United States*, 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939), the Supreme Court was confronted with the question of whether the Nelson Act created a conventional trust that could not be unilaterally modified by Congress. The Court concluded that it did not. It held that the United States did not enter into a formal trust agreement with the Chippewa. *Id.* at 4–5, 59 S.Ct. at 689. The practical effect of this is that Congress, in an exercise of its plenary power, can unilaterally modify the parties' relationship and the applicable ground rules by subsequent legislation. "We hold that the Act did not tie the hands of Congress so

that it could not depart from the plan envisaged therein, in the use of tribal property for the benefit of its Indian wards." *Id.* at 5, 59 S.Ct. at 689; *see also United States v. Sioux Nation*, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

A second effect of this distinction is explained in *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. at 185, 624 F.2d at 988:

> The general law of fiduciary relationships can be utilized to the extent appropriate.... This does not mean, however, that all the rules governing the relationship between private fiduciaries and their beneficiaries and accountings between them necessarily apply in full vigor in an accounting claim by an Indian tribe against the United States. We refer to such rules as the principle that once a breach of fiduciary duty is merely charged (without any supporting material), the beneficiary is entitled to recover unless the fiduciary affirmatively establishes that it properly discharged its trust, and the theory that failure to render the precise form of accounting required may be sufficient, in and of itself, to establish liability. In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government and the particular tribe.

This aspect of the unique trust created here is implemented in the court's holding elsewhere that the Red Lake Band has the burden of going forward with evidence to support those exceptions to the GAO Report that are not improper on their face.

With respect to the trust relationship, thus limited, the parties are somewhat at odds as to the precise scope of the Government's duty. Because there is no need to apply the duty, whatever its scope, at this

---

**18.** The court notes that expenditures or payments made to individuals may still benefit the tribe because of the nature of the tribal relationship. *Red Lake, Pembina and White Earth Bands, et al. v. United States*, 164 Ct.Cl. 389, 397 (1964). Moreover, if a disbursement was for the benefit of Minnesota Chippewa Indians oth-

er than Red Lake, assuming it was otherwise proper, the expenditure could still be offset against any amounts owed the Minnesota Chippewa. Finally, this court has, on at least one occasion when there was some evidence of tribal benefit, utilized an apportionment formula. *Navajo Tribe*, 9 Cl.Ct. at 385 n. 42.

stage, the court will restrict itself to defining the general parameters of the defendant's obligations as trustee.

In giving flesh to the defendant's duties, the Nelson Act and related treaties and legislation "define the contours of the United States' fiduciary responsibilities." *Mitchell*, 463 U.S. at 224, 103 S.Ct. at 2972; *Pawnee v. United States*, 830 F.2d 187, 192 (Fed.Cir.1987). Beyond the guidance given by the terms of those documents, the nature of the Government's duty as trustee has been variously defined. In *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 345, 512 F.2d 1390, 1392 (1975) (quoting *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917, 925 (1965)), the court held that "the United States as trustee has undertaken an obligation 'of the highest responsibility and trust'." *See also Yankton Sioux Tribe v. United States*, 224 Ct.Cl. 62, 72, 623 F.2d 159, 163 (1980); *Gila River Pima–Maricopa Indian Community v. United States*, 9 Cl.Ct. 660, 678 (1986). In *United States v. Mason*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), the Court stated that the United States is "duty bound to exercise great care in administering its trust." *Id.* at 398, 93 S.Ct. at 2207. It goes on to clarify: " 'A trustee is under a duty in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.' " *Id.* (quoting 2 A. Scott, *Trusts* 1408 (3d ed. 1967)).

■ The trustee also has the duty to keep clear and accurate accounts for its beneficiaries. 2 A. Scott *Law of Trusts*, § 172 (3d ed. 1967); 2 G. Bogert *Law of Trusts and Trustees* § 970 (rev. 2d ed. 1983). As stated in *Sioux Tribe*, 105 Ct.Cl. at 802, 64 F.Supp. at 331, "The defendant is the trustee; it kept and has all the records and evidence, and it has the burden of making a proper accounting."

In its pretrial briefing, defendant points to *Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 336 (1986), for the proposition that its actions are to be judged by the test of whether they were arbitrary or capricious. The Claims Court decision referred to relies in turn on *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265 (1981), where the Court of Claims holds:

It should be added that the standard by which Interior's actions are to be judicially tested is, not the court's or plaintiffs' own view of the preferable conduct, but the normal standard for government fiduciaries—were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, in abuse of discretion, or contrary to law? We repeat, too, the caution that all the rules governing the relationship between private fiduciaries and their beneficiaries do not necessarily apply in full vigor to Indian claims against the United States. "In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government" and the Indians.

*Id.* at 14–15, 664 F.2d at 274 (footnote omitted), quoting *Navajo Tribe v. United States, supra*, 224 Ct.Cl. at 185, 624 F.2d at 988.

Besides the cases pointed to by defendant, there are others which seem to give greater discretion in a fiduciary context to the Government's scope of action than normally would be the case for a trustee. For example, the Supreme Court in *Mason*, 412 U.S. at 398, 93 S.Ct. at 2207, uses language that the trustee's justment was "not wholly unreasonable." In *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 153, 550 F.2d 639, 653 (1977), the court tested defendant's actions to see if they constituted fraud or negligence.

The court notes however that the tests referred to in these cases were not expressed in the context of a disbursement accounting. They are easily distinguishable from the present issues to be tried because they all involve Government actions in areas in which fiduciaries are generally seen as having much greater discretion. For example, *Mitchell, Navajo*, 9 Cl.Ct. 336, and *Coast Indians* all involved claims of mismanagement of lands. They

did not involve accountings of monies disbursed out of a trust fund. While *Mason* did not turn on a question of management of physical assets, the Court recognized the very special circumstances there, in that a trustee was placed in a virtually untenable position of either risking a violation of existing tax requirements, or paying what ultimately turned out to be an improper tax.

Moreover, the Court of Claims has at least twice stated that the "arbitrary and capricious" standard is not the highest measure of fiduciary accountability:

It is well settled that "the standard of duty for the United States as trustee for Indians is not mere 'reasonableness,' but the highest fiduciary standards...." Moreover, as the Court noted in *Sac and Fox Tribe of Indians v. United States*, 167 Ct.Cl. 710, 724, 340 F.2d 368, 375 (1964):

In defining the fiduciary obligation assumed by the Government toward Indian tribes in cases involving land sales, this court said:

A breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust. [*United States v. Seminole Nation*, 146 Ct.Cl. 171, 179, 173 F.Supp. 784, 789 (1959).]

*Yankton Sioux Tribe v. United States*, 224 Ct.Cl. 62, 72, 623 F.2d 159, 163 (1980). *Yankton* involved accounting of funds raised by land sales, as does the case at bar. The court therefore concludes that the "arbitrary and capricious" test is not applicable to the matters currently set for trial.

*Remaining Issues*

Other issues raised by the parties' pretrial briefs will either be taken up in the course of trial, or in the context of motions *in limine*.

It is so ORDERED.