**HOPLAND BAND OF POMO INDIANS, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 557–86L.**

United States Claims Court.

Sept. 16, 1987.

278

David J. Rapport, Ukiah, Cal., attorney of record, for plaintiffs. California Indian Legal Services and Lester J. Marston, of counsel.

Glen R. Goodsell, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II, for defendant.

## OPINION

WIESE, Judge.

The Hopland Band of Pomo Indians is a federally recognized Indian tribe located in Mendocino County, California. The Tribe alleges that it suffered damages arising from the Government's premature—and admittedly unlawful—termination of its trust relationship with the California Indian Rancherias, including the Hopland Rancheria.

The termination was completed in 1967, but the present complaint was not filed until September 1986. The Government now moves to dismiss on grounds that the suit is time-barred. Plaintiff opposes the motion, arguing that the termination of tribal status imposed a legal disability upon the Tribe that justifies tolling of the limitations period.

Following oral argument on June 2, 1987, the court issued a bench ruling in defendant's favor but withheld final judgment to give plaintiff an opportunity to brief certain additional points of law.[1] Having received and considered this supplemental briefing, the court now orders that the complaint be dismissed on grounds of standing and failure to state a claim, as well as timeliness. The reasons for the decision are set forth below.

## I.

The Hopland Rancheria is one of several dozen small communities in California that were established for the benefit of small bands of homeless Indians. Title to the lands was vested in the United States in trust for the resident Indians.

In 1958, Congress passed the California Rancheria Act, Pub. L. No. 85–671, 72 Stat. 619. The Act established a procedure for terminating, with tribal consent, the Government's trust relationship with the rancherias. It provided for the distribution of the rancheria property directly to the individual Indians, either in the form of fee-simple conveyances or as proceeds from land sales. The Act was amended in 1964, Pub. L. No. 88–419, 78 Stat. 390, to require the Government, before undertaking any distribution, to improve the water and waste disposal facilities of the land under a tribally approved plan.

In 1961, the Government adopted a plan for terminating the Hopland Rancheria and obtained the necessary approval by majority vote of the adult citizens of the Tribe. As part of this plan, a 1,400-acre tract of grazing and recreation land known as "Parcel 1" was sold to a hunting club and the proceeds were distributed on a pro rata basis to the members of the Tribe ("the distributees"). The remainder of the rancheria property was conveyed directly to the distributees. All of the distributions—the cash from the property sale and the deeds for the rancheria lands—occurred between 1964 and 1967. When the last of the distributions was completed, the Hopland Band's status as a Tribe was formally terminated.

The termination proved to be unlawful, however, because the Government had failed to undertake the necessary water and sanitation improvements. In Septem-

---

1. The additional briefing pertained to certain issues which the court had raised on its own initiative in the form of specific questions to counsel that were included as part of an order of April 20, 1987 scheduling the case for argument.

ber of 1974, the Government admitted its error and wrote to each member of the Hopland Band, acknowledging the continuing existence of its trust relationship with the Tribe. Then, in 1978, several members of the Tribe sued for, and obtained, specific as well as monetary relief to redress injuries they attributed to the unlawful termination. The decision in their favor referred the computation of damages to a magistrate. *Smith v. United States*, 515 F.Supp. 56 (N.D.Cal.1978).

Following the district court's initial decision in *Smith*, a class representing the Indian distributees and their heirs intervened in the suit. Among other things, the class claimed damages for lost hunting and fishing rights (including the cost of obtaining hunting and fishing license fees) arising from the sale of Parcel 1. A stipulated final judgment on that claim was rendered by a federal magistrate in an unpublished order on March 18, 1986. *Smith v. United States*, No. C–74–1016 (N.D.Cal. Mar. 18, 1986).

## II.

In the suit now before this court, the Tribe asserts three claims. Count I of the complaint alleges that, with respect to Parcel I, the Tribe "has suffered damages from the loss of use of said land and the cost of replacing the land at current market values." Count II maintains that the Tribe, as well as certain of its members, was wrongfully excluded from the class of distributees in the original termination plan because the definition of tribal membership used in the plan was too restrictive. Finally, in Count III of the complaint, the Tribe contends that, because its tribal status was terminated, the Government breached a duty to provide the Tribe "with benefits and services available to federally recognized Indian tribes".

In considering these allegations of injury, we start with the proposition that the doctrine of res judicata precludes relitigation between the same parties or their privies of matters actually litigated and decided by a valid and final judgment, as well as those matters that could have been raised in the prior action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Thus, the threshold question that confronts the Tribe is whether the interests that it seeks to vindicate here in regard to Parcel 1 are distinct from those that were or could have been raised in the *Smith* litigation.

The Tribe purports to answer this question by saying that it brings this suit in its own behalf and not as a representative of the distributees. But this answer simply begs the question. What needs to be answered is whether "the Tribe, *qua* Tribe, has a discrete claim of injury * * * so as to confer standing upon it apart from the monetary injury asserted by the individual Indian plaintiffs." *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 468–69 n. 7, 96 S.Ct. 1634, 1639 n. 7, 48 L.Ed.2d 96 (1976). So far as Counts I and II are concerned, the answer is plainly "no".

■ As noted earlier, in Count I the Tribe claims damages "from the loss of use of said land [Parcel 1] and the cost of replacing the land at current market values." The court's problem with this claim is that it comes without any rational explanation as to how the economic interests it addresses can be considered distinct from those that were compensated at the time the land was sold and the proceeds distributed to the individual members of the Tribe. And indeed there exists no such explanation; the interests involved are one and the same. To explain:

"Fair market value", as that term is conventionally used, represents " 'what a willing buyer would pay in cash to a willing seller' ". *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979); *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). Thus, as a matter of definition, fair market value denotes an exchange of economic equivalents: the cash received in return for title to the land compensates the owner for the full bundle of rights that he transfers with the fee simple, *including the right claimed here* —the right to future use and enjoyment. Given this reality, what Count I comes

down to is an attempt by the Tribe to recover, under the guise of a different lawsuit, those same components of fair market value that were paid over to the individual tribal members many years ago. The claim lacks economic justification; it is a fiction.

■ Count II of the complaint is no less frivolous. The claim asserts that the Tribe, along with certain of its members, was unlawfully excluded from sharing in the distribution of the proceeds from the sale of Parcel 1.

The claim makes no sense. It bespeaks a contradiction to contend, on the one hand, that the Tribe was improperly excluded from the distribution of proceeds generated upon the sale of community assets and, on the other hand, to acknowledge that the sale was undertaken as part of a planned dissolution of the Tribe. Necessarily, with the dissolution of the Tribe, there can be no surviving ownership interests beyond those of the individual members.

■ As to the subordinate contention regarding individual members who did not participate in the distribution, the claim fares no better. Any argument pertaining to the fairness of the distribution scheme could have, and indeed should have, been raised at the time (mid–1979) the individuals named in the distribution plan sought the district court's approval to intervene as a class to assert their damages.[2] It was up to those persons who felt themselves wrongfully excluded from the distribution to protect their interests at that time.

■ Nor does the Tribe have any independent right to sue here now in their behalf. Like any association, an Indian tribe has standing to sue in behalf of its members "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause". *Warth v. Seldin*, 422

U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975). Where the claimed injuries are not common to the entire membership and their adjudication requires individualized proof, the organization as an entity lacks standing. *Id.* at 515–16, 95 S.Ct. at 2213–14. In this case, the claims of those individuals who believe they were wrongfully excluded from the class of distributees are not common to all members of the Tribe. In addition, adjudication of their claims would require an inquiry into each individual's lineage and background, however tribal membership is to be defined. Therefore, the Tribe has no standing to represent the "non-distributees" in Count II.

Finally, in Count III of its complaint, plaintiff alleges that, because its tribal status was terminated, the Government breached a duty to provide the Tribe "with benefits and services available to federally recognized Indian Tribes". Theoretically at least, loss of tribal benefits would represent a distinctly-tribal injury. However, as the allegation is framed before the court, plaintiff states no claim upon which relief can be granted.

■ The wrongful termination of tribal status can give rise to a claim for lost federal benefits only to the extent that the claimant would have had a right to sue for monetary relief if the Government had denied the benefits outright. *Duncan v. United States*, 229 Ct.Cl. 120, 139, 667 F.2d 36, 48 (1981). That right, in turn, must rest upon a source of substantive law that " 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983) (citations omitted). Thus, plaintiff here must establish that under federal law the Tribe would have been *entitled* to receive

---

**2.** Notice of that class action was published in mid–1979 pursuant to an order of the district court that read, in relevant part, as follows: "The federal defendants shall also publish Notice to potential class members in two newspapers of general circulation, one in Mendocino County and one in Sonoma County. Notice shall be published at least once a week for four weeks, between August 10, 1979 and September 1979. Plaintiffs shall post copies of the notice during the same time period at the California Indian Legal Services office in Ukiah, California, and at the Hopland Rancheria Tribal office."

certain benefits if its tribal status had been recognized.

■ The only statutory source of entitlement to which plaintiff directs the court's attention is § 104 of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450h (1982), which authorizes the Secretary to contract with or make grants to an Indian tribe in support of a variety of undertakings directed towards the improvement of Indian education, health services and government. However, this statute (the text of which we leave to a footnote[3]) does not mandate the payment of money. That is to say, the Secretary is not *required* to distribute grants; he merely is *authorized* to award grants from such funds as Congress may choose to appropriate for that purpose from time to time. Thus, the Secretary's arbitrary denial of an application for a tribal grant would give rise to an action for injunctive relief in the district court, but it could not give rise to a claim for monetary damages in the Claims Court. It follows that this court cannot

expand the Tribe's legal rights solely because the alleged arbitrary denial in this case resulted from the wrongful nonrecognition of tribal status. Therefore, plaintiff states no claim for monetary damages arising from its ineligibility for tribal grants.[4]

■ For the reasons stated above, it is unnecessary to address in full plaintiff's arguments in favor of a tolling of the statute of limitations. We would note in passing, however, that there is no merit in this position. Whatever legal disability the Tribe might have incurred as a result of the termination of its tribal status, the disability was lifted in 1978 when the district court issued its declaratory judgment in *Smith* and certainly by April 24, 1980 when the Government formally recognized the reestablishment of its trust relationship with the Hopland Band. *See* 45 Fed. Reg. 27,820 (1980). Any practical difficulties in bringing suit which the Tribe may have encountered thereafter on account of the still incomplete rehabilitation of its orga-

**3.** 25 U.S.C. § 450h (1982) reads as follows:

(a) * * *

The Secretary of the Interior is authorized, upon the request of any Indian tribe (from funds appropriated for the benefit of Indians pursuant to sections 13 and 52a of this title, and any Act subsequent thereto) to contract with or make a grant or grants to any tribal organization for—

(1) the strengthening or improvement of tribal government (including, but not limited to, the development, improvement, and administration of planning, financial management, or merit personnel systems; the improvement of tribally funded programs or activities; or the development, construction, improvement, maintenance, preservation, or operation of tribal facilities or resources);

(2) the planning, training, evaluation of other activities designed to improve the capacity of a tribal organization to enter into a contract or contracts pursuant to section 450f of this title and the additional costs associated with the initial years of operation under such a contract or contracts;

(3) the acquisition of land in connection with items (1) and (2) above: *Provided,* That in the case of land within reservation boundaries or which adjoins on at least two sides lands held in trust by the United States for the tribe or for individual Indians, the Secretary of Interior may (upon request of the tribe) acquire such land in trust for the tribe; or

(4) the planning, designing, monitoring, and evaluating of Federal programs serving the tribe.

(b) * * *

The Secretary of Health and Human Services may, in accordance with regulations adopted pursuant to section 450k of this title, make grants to any Indian tribe or tribal organization for—

(1) the development, construction, operation, provision, or maintenance of adequate health facilities or services including the training of personnel for such work, from funds appropriated to the Indian Health Service for Indian health services or Indian health facilities; or

(2) planning, training, evaluation or other activities designed to improve the capacity of a tribal organization to enter into a contract or contracts pursuant to section 450g of this title.

(c) * * *

The provisions of any other Act notwithstanding, any funds made available to a tribal organization under grants pursuant to this section may be used as matching shares for any other Federal grant programs which contribute to the purposes for which grants under this section are made.

**4.** In *Smith,* the Government stipulated that it was liable for educational, health and other benefits denied to individual Indians during the time that the Hopland Ranch trial status was not recognized. *See* 25 U.S.C. § 13 (1982).

nizational structure are simply not cognizable as a legal disability.

## CONCLUSION

For the reasons stated, defendant's motion to dismiss is granted and the Clerk is directed to enter judgment accordingly.