WHITE MOUNTAIN APACHE TRIBE OF ARIZONA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 22–H.

United States Claims Court.

May 9, 1990.

William H. Veeder, Washington, D.C., for plaintiff.

James M. Upton, Washington, D.C., with whom was Asst. Atty. Gen. Richard B. Stewart, for defendant.

## ORDER

NETTESHEIM, Judge.

### BACKGROUND

On February 6, 1987, this court entered an opinion awarding plaintiff White Mountain Apache Tribe of Arizona ("plaintiff") $5,424,429.00 for its claims for mismanagement of its water, rangeland, and timber resources. *White Mountain Apache Tribe*

*v. United States*, 11 Cl.Ct. 614 (1987). The opinion also provided that entry of judgment on the award should be deferred until judgment could enter on all plaintiff's claims comprehended by Docket No. 22–H. For over two years, the parties have engaged in developing the remaining "fiscal" or "accounting" claims. A scheduling order entered on February 6, 1987, on plaintiff's accounting claims, calling for a joint proposal to enable review of documentation, settlement discussions, and trial by specified dates. Separate proposals were filed by May 11, 1987. Plaintiff's proposal listed claims to which defendant objected. On June 26, 1987, the court orally ruled on the claims. Defendant was to submit a proposed order memorializing the ruling. After some time defendant submitted the order, to which plaintiff acceded as to form only, and the order entered on December 4, 1987. With parameters established by this ruling, as well as this court's earlier orders on the allowability of plaintiff's accounting claims reported as *White Mountain Apache Tribe v. United States*, 9 Cl.Ct. 158 (1985) (order granting and denying motion for summary judgment on exceptions to accounting); 9 Cl.Ct. 1 (1985) (order limiting supplemental accounting); 4 Cl.Ct. 586 (1984) (order on objections to 1978 trial on accounting issues), the parties commenced structured settlement discussions, reporting at periodic status conferences.

On December 1, 1988, an order entered adopting the parties' proposed schedule for consideration of plaintiff's proposals for settling all fiscal issues. This scheduling order contemplated submission to defendant of individual settlement proposals with regard to IMPL or POL (Indian Money Proceeds of Labor) accounts, IIM (Individual Indian Money) accounts, and railroad mill stumpage claims, with an overall settlement proposal to be submitted by June 1, 1989. This approach did not settle the remaining claims. At a status conference held on November 28, 1989, the parties reported that impediments to a global settlement were the disparate legal positions as to specified claims. It was agreed that resolution of the impasse would be assisted by the court's ruling on plaintiff's claims.

To that end, on November 28, 1989, an order entered directing plaintiff to list its fiscal claims and allowing defendant to file a motion to limit these claims and address the recoverability of interest as a generic issue. On January 31, 1990, Defendant's Motion *in Limine* and Motion To Dismiss with Respect to Plaintiff's Fiscal Claims were filed. This opinion addresses defendant's motions after argument.

The vintage of this case—1948—and the number of published judicial utterances by this judge alone—10 since 1984—warrant a peroration to address a concern that has nothing to do with the merits of plaintiff's claims, but, rather, the prospect of negotiated resolution in lieu of trial. A negotiated resolution of plaintiff's claims has been the stated objective of both parties since early 1987. However, plaintiff's misapprehension of the type of claim that remains for resolution is entirely inconsistent with a realistic prospect of achieving some success by way of negotiation. The list of fiscal claims filed on January 9, 1990, includes several claims that were rejected in the 1987 opinion dealing with plaintiff's claims for mismanagement of resources. For example, plaintiff seeks damages on the theory that the White Mountain Apache Indian Reservation was created and used for the benefit of the downstream non-Indian water users. After having been litigated fully, this claim was rejected at 11 Cl.Ct. 642–47. Another claim is tantamount to a motion for reconsideration of the order entered on December 15, 1987, barring plaintiff from pursuing its claim for the value of timber cut from 16,000 acres excluded from the White Mountain Apache Indian Reservation by an allegedly erroneous survey. The December 4, 1987 order rejected for the second time three other claims plaintiff included in its January 9, 1990 list—plaintiff's claim for an accounting pursuant to the Colyer agreement (also rejected in 1985 in 9 Cl.Ct. at 2–3); a claim for misuse of funds appropriated by Congress (also rejected in 9 Cl.Ct. at 161–63); and a claim for proceeds from sale of lumber deposited in the IMPL–Agency account (1920–1946) (also rejected in 11 Cl.Ct. at 673–74).

## DISCUSSION

Defendant moved *in limine* for an order barring plaintiff from pursuing any fiscal claims except those for IMPL or POL and IIM disbursements on the grounds that some have been barred by previous orders [1] or by the statute of limitations or were subsumed in other claims not barred. Alternatively, if its motion *in limine* were denied, defendant sought dismissal of all of plaintiff's claims seeking interest as damages.

### I. *Statute of limitations*

Paragraph 6 of the petition filed February 2, 1948, framed plaintiff's accounting claims, as follows:

That defendant undertook by Section 17 of the Act of September 9, 1850 and Section 7 of the Act of February 27, 1851, aforementioned, by the aforesaid Treaty of July 1, 1852, by the Treaty of July 27, 1853, concluded at Ft. Atkinson, Indian Territory between the United States and the C[o]manche, and Kiow[a], and Apache tribes, which treaty was duly ratified by the Senate on April 12, 1854 and proclaimed by the President of the United States on February 12, 1855, to protect the interests of plaintiffs in lands and other tribal property, as a trustee, but has instead permitted and encouraged divers private parties to enter into the area owned by the plaintiffs and to use the lands and waters and the products thereof and to exclude the plaintiffs therefrom, *has neglected to collect rentals, fees, and damages due to the plaintiffs, has expended funds held in trust for plaintiffs for purposes other than benefit to the plaintiffs, has sold and given away lands and other property of plaintiffs, and has not accounted to plaintiffs for the receipts derived from such sales and leases, all to the great damage of the plaintiffs.*

. . . .

WHEREFORE PLAINTIFFS PRAY that an account be taken of the Government of the United States from July 1, 1852 until August 13, 1946, that the account shall set out what lands and other tribal property have been taken from the plaintiffs by the defendant, taken by private persons acting without restraint from the defendant, or disposed of by the defendant without compensation to the plaintiffs, that the defendant be required by decree of this court to account for and pay over to plaintiffs all damages the plaintiffs may have suffered or sustained thereby, and for such other relief as to this court may seem just.

(Emphasis added; footnote omitted.)

Section 12 of the Indian Claims Commission Act of 1946, Pub.L. No. 726, 60 Stat. 1049, 1052 (1946) (codified at 25 U.S.C. § 70k (1976)) (omitted from Code pursuant to Commission termination on Sept. 30, 1978), bars claims that have not been "presented" within five years after August 13, 1946. *White Mountain Apache Tribe v. United States*, 8 Cl.Ct. 677, 681 (1985) (citing cases) (order granting in part motion to dismiss resource claims). Although this provision is jurisdictional, *Minnesota Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338, 340 n. 2 (Fed.Cir. 1985), the Federal Circuit has not departed from the precedent of the Court of Claims that the word "presented" should be read liberally to permit relation back if sufficient notice is given. *Id.* at 340 (citing *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 586, 372 F.2d 951, 959–61 (1967)). The inquiry is whether the general fact situation set forth in the original petition gives sufficient notice. *Minnesota Chippewa*, 768 F.2d at 340.

The 1948 petition, liberally construed, asks for a general accounting and specifically charges that the Government has neglected to collect fees due plaintiff, has expended funds held in trust for purposes other than to benefit plaintiff, has sold or

---

**1.** This order bars plaintiff from introducing evidence on claims that have been barred by previous orders. Claim "d(1)" was rejected by ¶ 2 of the order entered on December 4, 1987; claim "d(3)," by the order entered on December 15, 1987; claim "d(4)," by the order entered on November 8, 1985, *White Mountain Apache Tribe v. United States*, 9 Cl.Ct. at 3; claim "d(6)," by ¶ 1 of the December 4, 1987 order; and claim "d(7)," by ¶ 3 of the December 4, 1987 order.

given away property of plaintiff and has failed to account for receipts therefor. The challenged claims (that have not been rejected previously) concern stumpage rates and railroad costs (claim "c"), an 8– to 10–percent timber fee (claim "d(2)"), a 10–percent livestock fee (claim "d(5)"), and substantial quantities of lumber sold or otherwise disposed of without any compensation (claim "d(8)").

■ Defendant also moves with respect to plaintiff's global claim that plaintiff's reservation was operated for the benefit of non-Indian water users (claim "e"). The Claims Court in *Te–Moak Bands of Western Shoshone Indians v. United States,* 18 Cl.Ct. 74 (1989) (order dismissing exceptions), recently disallowed a claim for deprivation of water rights as not within the tribe's claim for an accounting. Claim "e" does no more than attempt to recast plaintiff's water resources mismanagement claim as an accounting claim. However, this court did allow plaintiff to assert its water resources claim as one of its three resource claims. The water resources claim related back to the claim for a general accounting in plaintiff's petition filed on October 27, 1959.[2] *White Mountain Apache Tribe,* 8 Cl.Ct. 677. Plaintiff has had its day in court on its claim covering water, whether denominated as a resource or an accounting claim. Consequently, the doctrine of law of the case forecloses plaintiff, since the water claim was fully litigated and decided in *White Mountain Apache Tribe,* 11 Cl.Ct. at 622–47.

Defendant urges a special rule to govern the relation back inquiry in accounting cases on the basis that a " 'special' ... analysis applies to true accounting (or fiscal) claims...." Def's Br. filed Mar. 16, 1990, at 6. According to defendant, this analysis was relied on in *Minnesota Chippewa Tribe v. United States,* 14 Cl.Ct. 116, 126 (1987) (order disallowing statute of limitations defense to accounting claims), and takes the form of acknowledging that

a petition's request for accounting with respect to disbursements can disclose matters of which an Indian tribe was unaware and which are inherently unknowable until receipt of a government report on disbursements. Judge Bruggink wrote:

> In determining whether a particular challenge to a disbursement is embraced within the request for an accounting, as originally pleaded in the petition and exceptions, the court will be mindful of plaintiff's potential inability, if that be the case, to plead with greater specificity until it reviewed the backup documents.

*Id.* Chief Judge Smith in *Te–Moak* took the approach that, although the issuance of an accounting does not toll the statute of limitations, the basic inquiry is whether the claims could have been raised as a product of the tribe's own independent means, as opposed to discovering the violations through review of a government-supplied accounting. *See Te–Moak,* 18 Cl.Ct. at 81. Defendant contends that the four challenged claims are time barred since plaintiff has admitted in brief that they were unearthed through the tribe's own "investigations." *See* Plf's Br. filed Mar. 1, 1990, at 12–13.

■ 1. Claim "c"—"Railroad–Mill Stumpage Claims." This claim is for excessive costs for the cost of the railroad from the McNary Mill to the railhead at Holbrook, including excessive freight charges, and the cost of constructing the McNary Mill—all charged off against the price plaintiff received for its timber. Plaintiff admits that the accounting reports and other information supplied by the Government were "devoid of *any* reference to the impropriety of placing upon Plaintiff Tribe the vast share of the costs of construction, maintenance, and operation of the mill and railroad." Plf's Br. filed Mar. 1, 1990, at 8 (emphasis in original). Indeed, plaintiff's epiphany occurred during preparation for the 1987 trial on plaintiff's mismanagement of timber resources.

---

**2.** The labyrinthine history of this litigation reveals that the parties represented at the time that the original accounting petition was filed on October 27, 1959.

A review of the case law [3] confirms that the doctrine of relation back does not preserve a claim that is tantamount to a new cause of action. For example, the Federal Circuit in *Minnesota Chippewa* disallowed a band-by-band accounting and an accounting of allotments taken from one band's lands and given to another when the petition and exceptions did not reveal that the plaintiff was other than one band or that allotments were challenged. 768 F.2d at 342.[4] Chief Judge Smith in *Te–Moak* disallowed a claim for an accounting of water rights when the accounting claim in the original petition did not refer to the reservation. 18 Cl.Ct. at 81–82.

The court declines to utilize defendant's special analysis because plaintiff's claim is within the scope of the accounting claim in its original petition, which asks for an accounting based on the failure to collect fees, the expenditure of trust funds for purposes other than to benefit plaintiff, and the sale of plaintiff's property without an account of the receipts therefrom. The refinement of this claim comes within the tolerance allowed a party to refine its claim well in advance of the filing of its pretrial memoranda and scheduling of trial. Defendant does not argue that plaintiff should have or could have pleaded this claim in 1948 with the specificity that plaintiff now brings to the task. It is sufficient that the claim is consistent with and includable within a cause of action as pleaded in the original petition and does not state a new cause of action.

Plaintiff will be allowed to introduce evidence on claim "c" only insofar as it seeks an accounting of stumpage revenues against costs of the railroad from the McNary Mill to the railroad at Holbrook, freight charges, and costs of construction—all deemed by plaintiff to be excessive. Plaintiff's claim for interest is disallowed, as discussed *infra*.

■ 2. Claim "d(2)"—"8–10% Fee." This claim is for an alleged improper deduction from the proceeds of sale of tribal timber pursuant to a federal statute that required payment of an 8–percent fee (later increased to 10 percent) for the administration of the tribe's forest. Because this court ruled in its 1987 resource mismanagement opinion that the Government had overcut and, hence, mismanaged one area of forest, 11 Cl.Ct. at 668–71, plaintiff claims that the fees were actually paid to the trustee for mismanaging its forest and causing the tribe damage. As with respect to its railroad-mill stumpage claim, plaintiff states this claim was unknowable until it undertook to prepare for the resource mismanagement trial.

Plaintiff will be precluded from presenting evidence on this claim since it is not fiscal or accounting in nature. The claim is not predicated on wrongful disbursements of monies kept in trust, as there is no allegation that more of a fee was exacted than authorized by law. *Mitchell v. United States*, 229 Ct.Cl. 1, 16, 664 F.2d 265, 275 (1981), *aff'd*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Plaintiff's claims for mismanagement of its timber resources were addressed fully by an award of damages. To retrospectively deduct a proportion of the fee paid to the trustee for administration of that part of the forest found to be overcut would not be practicable, even if the claim were legally recognized.

■ 3. Claim "d(5)"—"10% Livestock Fee." The accounting records made available to plaintiff revealed that tribal funds were expended for livestock operations. These records showed that a 10–percent

---

**3.** *Menominee Tribe of Indians v. United States,* 726 F.2d 718 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984), did not involve the Indian Claims Commission Act, but is not inconsistent with the result reached in this case. There the appeals court overturned a trial court decision that the Claims Court's six-year statute of limitations was tolled due to the tribe's excusable ignorance of the facts underlying its claim based on forest mismanagement until the tribe itself began to manage the forest. The record disclaimed any basis for the tribe's purported ignorance, since the tribe was involved actively for years in the transfer of operations.

**4.** As to the allotment claim, the court also considered plaintiff's pretrial statement to ascertain if the requisite notice had been given.

fee, pursuant to a statute, was charged on all livestock sales. In its March 1, 1990 brief, plaintiff claimed that it only discovered that this fee actually had been collected during the preparation for the resources mismanagement trial. The basis for this claim is, in plaintiff's phrasing, "[I]t is wholly improper for the Trustee simultaneously to charge a fee of 10% while utilizing the Tribal funds exceeding a half million dollars for livestock operations...." Plf's Br. filed Jan. 1, 1990, at 16. There is no legitimate basis for plaintiff's challenge to this fee. As discussed in connection with the preceding claim, the fee was lawfully exacted and collected. Plaintiff may pursue its claim challenging the additional expenditure of tribal funds totalling $547,-533.00 for livestock operations, including disbursements for individual Indians conducting their own livestock operations. The latter claim is a permissible refining of the focused accounting claim made in plaintiff's original petition and will be allowed for the reasons stated in respect of claim "c." Plaintiff's claim to lost investment yield on the livestock operation monies handled within the IIM account is disallowed, as discussed *infra*.

▉ 4. Claim "d(8)"—"Lumber/Timber Disposed of Without Compensation." Plaintiff takes the position that the 1975 accounting report does not refer to "substantial dispositions of timber/lumber" from the reservation without compensation to the tribe, although plaintiff located "Logging and Sawmill Records maintained by the superintendent on the Fort Apache Reservation, [that] evidence the practice of utilizing Tribal lumber/timber for government and other purposes...." Plf's Br. filed Mar. 1, 1990, at 13. Defendant responded at argument that this was the sole claim that arguably came within the accounting sought by the original petition, since it seeks revenues for property that the Government sold without accounting for the proceeds. The court deems this claim to fall literally within the scope of the 1948 original petition for the reasons discussed in connection with claim "c" and allows it to proceed. Plaintiff's claim for interest is disallowed, as discussed *infra*.

## II. *Claims for interest and lost investment yield*

Defendant's motion to dismiss is directed to plaintiff's claims for interest and lost investment yield. The court will deal with plaintiff's claims generically, rather than claim by claim. Basically, plaintiff makes three claims that defendant seeks to dismiss: 1) 4–percent simple interest from 1930–1990 on all POL funds in respect of monies that should not have been diverted to IIM accounts to avoid payment of statutory interest; 2) payment of 4–percent simple interest from 1930–1990 on monies that should have been deposited to plaintiff's POL account, but were not deposited due to acts of mismanagement or other breaches of fiduciary duty; and 3) lost investment yield from 1897–1990.

Ch. 483, the Act of June 13, 1930, 46 Stat. 584 (codified at 25 U.S.C. § 161b (1982)) (the "1930 Act"), provided that tribal IMPL funds were to bear 4–percent simple interest. The parties do not dispute that plaintiff is entitled to recover 4–percent simple interest on any challenged disbursement from POL funds that the court disallows pursuant to 25 U.S.C. § 161b. There is no similar provision for IIM disbursements.

▉ 1. With respect to disallowed disbursements from an IMPL trust account made prior to July 1, 1930, the effective date of the 1930 Act, a tribe may recover 4–percent simple interest from 1930 to date of judgment; after July 1, 1930, the 4–percent simple interest is recoverable from the actual date of the disallowed disbursement. *See Blackfeet & Gros Ventre Tribes of Indians v. United States*, 32 Ind.Cl.Comm. 65, 116–18 (1973), *reh'g denied*, 34 Ind.Cl. Comm. 122 (1974). However, plaintiff takes the tack that simple interest is mandated by statute in respect of all monies that should have been deposited to plaintiff's POL account but for the Government's breach of fiduciary duty in diverting monies from POL accounts to IIM accounts to avoid payment of the statutory interest, *i.e.*, claim "b." The Court of Claims in

*Mitchell,* 229 Ct.Cl. at 16, 664 F.2d at 275, held that interest on monies which should have been generated by proper management of Indian-owned resources and which should have been deposited to POL accounts was not recoverable. *See also Navajo Tribe v. United States,* 9 Cl.Ct. 227, 270–72 (1985); *Navajo Tribe v. United States,* 9 Cl.Ct. 336, 440 (1986). Amounts that were not in plaintiff's POL account are not subject to 4–percent interest pursuant to 25 U.S.C. § 161b.

■ 2. Plaintiff also contends that the Government must pay simple interest on all monies that would have inured to plaintiff's POL trust account but for the Government's overcharging plaintiff, failing to collect revenues or other acts of mismanagement, *e.g.,* claim "c"—overcharge for cost of a railroad; claim "d(8)"—timber/lumber disposed of without compensation. The Court of Claims decision in *Mitchell,* 229 Ct.Cl. at 16, 664 F.2d at 275, compels rejection of this type of claim.

■ 3. Plaintiff predicates recovery for lost investment income from 1897–1990 on the Act of May 25, 1918, ch. 86 § 28, 40 Stat. 591, *as amended by* Act of June 24, 1938, § 1, 52 Stat. 1037 (codified as amended at 25 U.S.C. § 162a (1988)) ("the 1918 Act"). Damages, not measurable by a flat rate of interest, are sought for breach of the obligation imposed by the 1918 Act. *See* Plf's Br. filed Mar. 1, 1990, at 25. Section 28 provides in full:

That the Secretary of the Interior be, and he is hereby authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and segregate the common, or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States, and which are susceptible of segregation, so as to credit an equal share to each and every recognized member of the tribe except those whose pro rata shares have already been withdrawn under existing law, and to deposit the funds so segregated in banks to be selected by him, in the State or States in which the tribe is located, subject to withdrawal for payment to the individual owners or expenditure for their benefit under the regulations governing the use of other individual Indian moneys. The said Secretary is also authorized, under such rules and regulations as he may prescribe, to withdraw from the Treasury and deposit in banks in the State or States in which the tribe is located to the credit of the respective tribes, such common, or community, trust funds as are not susceptible of segregation as aforesaid, and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks: **Provided,** That no tribal or individual Indian money shall be deposited in any bank until the bank shall have agreed to pay interest thereon at a reasonable rate and shall have furnished an acceptable bond or collateral security therefor, and United States bonds may be furnished as collateral security for either tribal or individual funds so deposited, in lieu of surety bonds: **Provided, further,** That the Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in United States Government bonds: **And provided further,** That any part of tribal funds required for support of schools or pay of tribal officers shall be excepted from segregation or deposit as herein authorized and the same shall be expended for the purposes aforesaid: **Provided, however,** That the funds of any tribe shall not be segregated until the final rolls of said tribe are complete: **And provided further,** That the foregoing shall not apply to the funds of the Five Civilized Tribes, or the Osage Tribe of Indians, in the State of Oklahoma, but the funds of such tribes and individual members thereof shall be deposited in the banks of Oklahoma or in the United States Treasury and may be secured by the deposit of United States bonds.

(Bold in original.)

Section 28 of the 1918 Act empowers the Secretary of the Interior to deposit tribal trust funds in interest-bearing accounts.

So as to protect the tribal communities, Congress attached limitations on the exercise of the Secretary's authority. With respect to those tribal funds that were susceptible to segregation—so that it was possible to credit each member of the tribe a pro rata share—Congress directed that the accounts be accessible. Funds were not to be segregated until the final rolls of the tribe were complete, funds for the support of schools and the salaries of tribal officers were excepted from segregation, and the funds of both the Five Civilized Tribes and the Osage Tribe were only to be deposited in Oklahoma banks or the United States Treasury. Section 28 provides that segregated funds should be subject to withdrawal by the Secretary as provided for under department regulations. As to all tribal funds, either segregable or non-segregable, further limitations on the authority to deposit were imposed. Tribal funds were deposited only in banks that were located in states where members of the tribe reside, that collateralized the deposits with an acceptable security, and that agreed to pay a reasonable rate of interest. An option extended to the Secretary, in lieu of deposits in state banks, was investment of tribal funds in United States Government bonds.

The law is unequivocal that absent a statute expressly providing for the payment of interest, separate from a general waiver of immunity to suit, the United States is immune from an award of interest as damages. 28 U.S.C. § 2516(a) (1982); *Library of Congress v. Shaw*, 478 U.S. 310, 314–17, 106 S.Ct. 2957, 2961–63, 92 L.Ed.2d 250 (1986); *United States v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 552–53, 95 L.Ed. 738 (1951); *Rogers v. United States*, 877 F.2d 1550, 1556 (Fed. Cir.1989). The Indian Claims Commission Act did not waive the sovereign's immunity to interest. *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 378, 518 F.2d 1309, 1315 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

Absent proof of a statute, treaty, or contract expressly establishing the Government's obligation to pay interest, an Indian tribe cannot recover interest against the Government. *Id.* In determining whether Congress waived immunity to suit by the 1918 Act, the waiver must be construed strictly in favor of the sovereign. *Shaw*, 478 U.S. at 318, 106 S.Ct. at 2963; *Mescalero Apache*, 207 Ct.Cl. at 379–80, 518 F.2d at 1315.

In *Cheyenne–Arapaho Tribes of Indians v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975),[5] Judge Davis for the Court of Claims explained the background of the 1918 Act:

The statutory scheme is that Indian trust funds deposited in the Treasury are to earn interest at the rate provided in the appropriate treaty or appropriations bill, and that if no interest rate is specified, the funds are to earn four percent simple interest per year. In *Menominee Tribe of Indians v. United States*, 97 Ct.Cl. 158, 163–65 (1942), the court held that this provision prohibited the Treasury from paying interest on the interest earned by funds on deposit. Accordingly, the various interest funds owned by plaintiffs, when held in the Treasury, are totally unproductive. Defendant has in fact paid four percent simple interest on plaintiffs' other funds, and if this were the limit of the Government's power, plaintiffs' claim, which does not attack the statutes, would have to fail.

However, holding the money in the Treasury is only one of defendant's statutory alternatives. Until 1880, tribal funds, rather than being deposited in the Treasury, were required by law to be invested, usually at a minimum rate of return of 5%. Because of defaults on some bonds in which the Secretary of Interior had invested and due to declining interest rates, Congress provided by the Act of April 1, 1880, ch. 41, 21 Stat. 70, for the holding of moneys in the

---

5. In a 1985 order, this court denied defendant's motion to dismiss on much the same claim under the 1918 Act as plaintiff now asserts more broadly. The basis of defendant's earlier motion was that the decision in *Cheyenne–Arapaho* foreclosed plaintiff's claim to make its IMPL trust funds productive prior to June 1930 and thereafter. *See White Mountain Apache Tribe*, 9 Cl.Ct. at 166. The order did not address the question of interest as damages.

Treasury and payment of interest as an alternative to investment when the Secretary of the Interior "is of the opinion that the best interests of the Indians will be promoted by such deposits, in lieu of investments." Interest on Indian trust funds, where no rate was specified by the law or treaty setting up the fund, was set at four percent by the Act of Feb. 12, 1929, ch. 178, 45 Stat. 1164. In 1918, Congress clarified and limited the Secretary's power to invest rather than hold Indian funds by providing that the Secretary could withdraw Indian funds from the Treasury and place them in banks where such banks paid a higher rate of interest than the Treasury was obligated to give, and he could also invest the funds "for the best interest of the Indians" in "any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States."

It is therefore legally possible, depending on the state of the market, for the Secretary, by investing rather than holding Indian funds, to provide the Indians with more than 4 percent simple interest. Because the investments are required by statute to be either heavily collateralized (in the case of bank deposits) or guaranteed by the Government, safety is not an issue. Moreover, because of the existence of a secondary market in many of the permitted investments (e.g., Treasury bills, Federal Home Loan Bank Board notes, Federal Intermediate Credit Bank notes, etc.), sudden requirements for cash do not present major obstacles to these types of investments. The four percent attainable by retaining the funds in the Treasury is, as another court has stated, a floor rather than a ceiling.

The fiduciary duty which the United States undertook with respect to these funds includes the "obligation to maximize the trust income by prudent invest-

ment," and the trustee has the burden of proof to justify less than a maximum return. . . .

*Cheyenne–Arapaho*, 206 Ct.Cl. at 346–48, 512 F.2d at 1393–94 (citations and footnotes omitted). The Court of Claims directed its Trial Division to determine the maximum return available during the period at issue, as well as whether the Government breached its duties by not making suitable investments. *Id.* at 350, 512 F.2d at 1395.

In *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309, the Court of Claims overturned an award of simple and compound interest on IMPL funds from 1883, when they were first deposited in the Treasury, to 1930, when Congress first directed the payment of 4–percent simple interest. The court specifically disclaimed the Indian Claims Commission's rationale to avoid the no-interest rule by characterizing the interest " 'damages.' " 207 Ct.Cl. at 386, 518 F.2d at 1320. Canvassing the case law denying interest as damages, the Court of Claims concluded:

It may be seen from the foregoing decisions that the character or nature of "interest" cannot be changed by calling it "damages," "loss," "earned increment," "just compensation," "discount," "offset," or "penalty," or any other term, because it is still interest and the no-interest rule applies to it.

207 Ct.Cl. at 389, 518 F.2d at 1322 (footnote omitted) (quoted in *Shaw*, 478 U.S. at 321, 106 S.Ct. at 2965).

The Court of Claims in *Mescalero Apache* ruled that neither the Act of September 11, 1841, ch. 25, 5 Stat. 465 (codified at 31 U.S.C. § 547a (1976)) (the "1841 Act"), nor the Indian Claims Commission Act, 25 U.S.C. § 70a, required "specifically and unequivocally" the award of interest on IMPL accounts before 1930. 207 Ct.Cl. at 380, 518 F.2d at 1316. The 1918 Act was not considered.[6] However, the discussion

---

**6.** Judge Davis mentions the 1918 Act in his dissent as a law "allowing the investment of" Indian tribe trust funds in United States Government bonds. *Mescalero Apache*, 207 Ct.Cl. at

410 n. 1, 518 F.2d at 1334 n. 1; *see Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 196–97 n. 24, 624 F.2d 981, 994, n. 24 (1980) (Davis,

of the 1841 Act is illuminating. That Act provided:

Chap. XXV.—An Act to repeal a part of the sixth section of the act, entitled "An act to provide for the support of the Military Academy of the United States for the year eighteen hundred and thirty-eight, and for other purposes," passed July seventh, eighteen hundred and thirty-eight.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That so much of the sixth section of an act entitled, "An act to provide for the support of the Military Academy of the United States for the year eighteen hundred and thirty-eight, and for other purposes," as requires the Secretary of the Treasury to invest the annual interest accruing on the investment of the money arising from the bequest of the late James Smithson, of London, in the stocks of States, be, and the same is hereby, repealed. And the Secretary of the Treasury shall, until Congress shall appropriate said accruing interest to the purposes prescribed by the testator for the increase and diffusion of knowledge among men, invest said accruing interest in any stock of the United States bearing a rate of interest not less than five per centum per annum.

Sec. 2. And be it further enacted, that all other funds held in trust by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, shall in like manner be invested in stocks of the United States, bearing a like rate of interest.

Sec. 3. And be it further enacted, That the three clerks, authorized by the act of June twenty-third, eighteen hundred and thirty-six, "to regulate the deposits of the public money," be, and hereby are, directed to be retained and employed in the Treasury department, as provided in said act, until the state of the public business becomes such that their services can conveniently be dispensed with.

J., suggesting that the *Mescalero Apache* court

*Id.* 207 Ct.Cl. at 392–93, 518 F.2d at 1323–24 (bold in original). The Court of Claims construed the 1841 Act, as follows:

In the first place, the Act did not expressly require the Government to pay interest to Indian tribes or anyone else. It was merely a directive to the appropriate officers of the Government holding trust funds that were *required* by treaty, contract, or statute to be invested, to invest them *only* in stocks of the United States, bearing interest at not less than five percent per annum. The primary purpose of the Act was to prevent any future investment of trust funds in state stocks or bonds. Thus the Act did not create any obligation on the Government to pay interest on trust funds, but only provided *where* they must be invested if any statute or treaty required them to be productive....

*Id.* at 393, 518 F.2d at 1324 (emphasis in original). *Mescalero Apache* therefore held that the 1841 Act did not apply to the tribe's IMPL funds, but prohibited investment of United States trust funds, that were required by treaty or statute to be productive, in state bonds and required the investment to be in United States securities. Moreover, the Court of Claims ruled that the 1841 Act did not obligate the payment of interest on any fund that was not expressly required to be productive by a contract, treaty, or statute. *Id.* at 404, 518 F.2d at 1330.

In *Gila River Pima–Maricopa Indian Community v. United States*, 218 Ct.Cl. 74, 586 F.2d 209 (1978), the Court of Claims reaffirmed that interest at the rate of 4 percent per year is recoverable on IMPL funds, per the 1930 Act, but overturned an Indian Claims Commission award of interest on IIM accounts. The court reasoned that "such interest as damages is clearly precluded" with respect to IIM accounts, since no statute exists requiring interest to be paid thereon. 218 Ct.Cl. at 85–86, 586 F.2d at 216–17 (footnote omitted). Defendant reads this case as refusing to recognize the 1918 Act as a separate waiver of sovereign immunity, in that the Court of

may not have considered the 1918 Act).

Claims could have followed *Cheyenne–Arapaho*'s construction of the 1918 Act and recognized an obligation to pay interest on wrongful disbursements of IIM funds. But this argument lacks a vital premise: that the Commission considered the 1918 Act in making the award or that the Indians made the argument to the court.

The next chapter in the interpretation of the 1918 Act is found in *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 624 F.2d 981 (1980). The Court of Claims rejected the tribe's claim that the Government had an obligation before July 1, 1930, the effective date of the 1930 Act, to invest its funds in trust based on *Mescalero Apache*. The Navajo tribe made the same claim as plaintiff makes for the period after July 1, 1930: to have the interest its tribal funds would have earned if they had been invested productively. Judge Davis then opined:

> As for a separate obligation to invest tribal funds productively—whether those funds be earned interest or other tribal funds—the matter is not at all clear at this stage, and does not seem to have been sufficiently canvassed at the trial level. The presentation, based on Congressional enactments, made to us on this point by plaintiff and by the brief amicus curiae is substantial. We think, again, that the problem deserves further consideration and we remand the issue to the trial judge so that he can reconsider it in the light, not only of *Mescalero*, but also of *Cheyenne–Arapaho* (which was not overruled in *Mescalero*, see *Mitchell v. United States*, 219 Ct.Cl. 95, 106, 591 F.2d 1300 (1979) *rev'd on other grounds*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), and the pertinent legislation which was not rejected in *Mescalero* (*see supra*)—as well as the relevant facts to be proved....

224 Ct.Cl. at 197, 624 F.2d at 995. The Court of Claims remanded the issue to its Trial Division with instructions to "appraise the impact of" the 1918 Act and its amendment.[7] 224 Ct.Cl. at 196–97 & n. 24, 624 F.2d at 995 & n. 24. Defendant asks why the Court of Claims did so, if the 1918 Act could command the result plaintiff asks for here as a matter of statutory interpretation. The question is valid, but it cannot be answered.

In 1981 Judge Davis took occasion in the Court of Claims *Mitchell* decision to explicate the obligation to invest imposed by the 1918 Act:

> A somewhat different problem involves interest. Our decision in *Cheyenne–Arapaho Tribes of Indians v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975), deals with interest on Indian funds for the period after the August 1946 closing-date of Indian Claims Commission claims. Briefly, tribal trust funds and proceeds of the sale of Indian lands must be held in the Treasury at interest under 25 U.S.C. §§ 161a and 161b (1976), but an alternative under § 162a is deposit in banks; this also applies to the funds held by the United States for individual Indians, 25 U.S.C. § 162a (1976). The bank deposits are subject to rigid statutory precautions to assure complete safety. The holding of *Cheyenne–Arapaho* is that defendant must as trustee exercise reasonable management zeal to get for the Indians the best rate, the statutory 4% being but a floor, not a ceiling. *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), which defendant says overruled *Cheyenne–Arapaho*, did not do so; it involved different statutes and periods of time from those with which we were concerned in *Cheyenne–Arapaho* and are concerned with here.

*Mitchell*, 229 Ct.Cl. at 15–16, 664 F.2d at 274 (footnote omitted). Defendant says that this recapitulation of the holding in

---

7. The Act of June 24, 1938, ch. 648, 52 Stat. 1037 (codified at 25 U.S.C. § 162a (1988)), is the amendment to the 1918 Act, which had the effect of repealing and replacing it. The 1938 statute did not differ in respect crucial to this opinion. The amendment increased the Secretary of Interior's options and specified the type of collateral acceptable to secure a deposit of trust funds.

*Mescalero Apache* was not a holding that the 1918 Act expressly directed the payment of interest. Defendant is correct. However, the result was that the 1918 Act did waive the Government's immunity to suit.

Defendant argues that the Supreme Court's decision in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), commands that a statute authorizing the Secretary of the Treasury to invest certain types of Indian trust funds cannot fairly be interpreted either to mandate compensation by the Government or permit suit if the Secretary's authorization is not acted upon. Defendant concludes that breach of the fiduciary duty to invest Indian money is not actionable in this court under the Tucker Act. 28 U.S.C. § 1491(a)(1) (1982).

The Supreme Court's 1983 opinion in *Mitchell* held that an action for damages may be maintained in the Claims Court, for breach of a trust arrangement, only in cases where the regulations are so detailed that they implicitly require compensation. The Supreme Court reasoned:

> The recognition of a damages remedy also furthers the purposes of the statutes and regulations, which clearly require that the Secretary manage Indian resources so as to generate proceeds for the Indians. It would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the resources if the Secretary's duties are not performed. "Absent a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust." *United States v. Mitchell*, 445 U.S. at 550 [100 S.Ct. at 1357] (White, J., dissenting).

463 U.S. at 226–27, 103 S.Ct. at 2972–73 (citation omitted).

Section 28 of the 1918 Act does not parallel the comprehensive system of regulations governing management of timber resources at issue in the *Mitchell* case. De-

fendant therefore concludes that the authorization created by the 1918 Act cannot be sustained as a directive mandating the Secretary of the Interior to maximize investment yield. The flaw in defendant's reasoning is that while *Mitchell* is the definitive ruling as to what circumstances established by statute and regulations will impose on the Secretary a duty tantamount to a mandate to pay money, the Supreme Court decision in *Mitchell* also recognizes that its analytical approach to imply an obligation to pay money is necessary only when such an obligation is not explicit. The *Mitchell* Court itself supplies a fiduciary's obligation to maximize the trustee's own income as the quintessential example of the explicit duty:

> Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980).

*Mitchell*, 463 U.S. at 225, 103 S.Ct. at 2972 (footnote omitted); *cf. Hopland Band of Pomo Indians v. United States*, 13 Cl.Ct. 276, 281 (1987), *vacated & remanded on other grounds*, 855 F.2d 1573 (Fed.Cir. 1988). The trial court in *Hopland Band* could not construe an authorization to the Secretary of the Interior to provide grants for education as tantamount to a mandate that the money be provided. To that extent defendant's reliance on the case is unassailable. However, the money for the grants was subject to appropriation by Congress; it did not belong to the tribe.

The 1918 Act establishes and circumscribes the Secretary of the Interior's authority to invest funds. Exercise of that authority within the parameters established by the Act calls for the production of money. The 1918 Act constitutes a waiver of immunity insofar as it creates a substantive right enforceable against the United States for money damages. *See Mitchell,* 463 U.S. at 216, 103 S.Ct. at 2967–68.

The case law discussing the 1918 Act over the years, however, fails to come to grips with the impediment to recovery under the 1918 Act. The statute does not expressly mandate that payment of interest as damages, and interest is the measure of damages that plaintiff seeks for breach of the duty established by the 1918 Act. *Mescalero Apache* is unrelenting authority that to constitute the requisite waiver of immunity a statute must require the payment by the United States of interest on a fund that expressly is required to be productive by a contract, treaty, or statute. The 1918 Act does not require the Secretary of the Interior to make the tribe's IMPL fund productive—it authorizes the Secretary to obtain favorable bank interest rates if the Government is not obligated by law to pay higher rates. In contrast, the 1841 Act construed in *Mescalero Apache* required the Secretary of the Treasury to invest accruing interest in United States stock bearing a stipulated interest rate. The 1841 Act also required that all other trust funds and the interest thereon, absent treaty otherwise providing, be invested in like United States stocks.[8]

Even if *Mescalero Apache's* criteria for a fund that expressly is required to be productive are too strict after the 1983 Supreme Court decision in *Mitchell,* the Federal Circuit confirmed in *Rogers* that the waiver of immunity to pay interest must be separate from the waiver of immunity enabling a suit for damages. 877 F.2d at

1556 (citing *Shaw,* 478 U.S. at 316, 106 S.Ct. at 2962). *Shaw* laid to rest the argument that damages representing compensation for the belated receipt of money, including delay damages, are not barred by the no-interest rule. *Shaw,* at 322, 106 S.Ct. at 2965–66.

Given the substantial jurisprudence from the Supreme Court and the Court of Claims insisting that the proponent of interest as damages demonstrate the sovereign's express waiver of immunity to this measure, however characterized, the 1918 Act cannot be construed as an express waiver. The statute does not create *damnum absque injuria,* since breach of the fiduciary duty imposed theoretically is redressable by an action at law. However, the 1918 Act does not permit an action against the Government seeking lost investment yield measurable by interest.

Based on the foregoing,

IT IS ORDERED, as follows:

Defendant's motion to dismiss is granted, and its motion *in limine* is granted in part and denied in part, as follows:[9]

1. No evidence may be adduced to support plaintiff's claims denominated as "d(1)," "d(2)," "d(3)," "d(4)," "d(6)," "d(7)," and "e." Evidence in respect of claims "c," "d(5)," and "d(8)" may be admitted consistent with the terms of this order.

2. All claims for 4–percent simple interest are dismissed other than claim "a."

3. Claims "a" and "b" are dismissed, insofar as they seek lost investment yield based on the 1918 Act. Claim "b" is dismissed insofar as it seeks 4–percent interest for funds diverted to plaintiff's IIM account.

4. Claim "c" is dismissed insofar as it seeks 4–percent interest and lost investment yield. Claim "d(5)" is dismissed inso-

---

8. Defendant points out that the House version of section 28 of the 1918 Act, H.R. 8696, 65th Cong., 2d Sess. (1918), read: "That the Commissioner of Indian Affairs be, and he is hereby, authorized and directed...." The word "directed" was stricken from section 28 by the Conference Report, S.Doc. 215, 65th Cong., 2d Sess. 8 (1918).

9. All of plaintiff's claims discussed at pp. 21–32 of plaintiff's brief filed on January 9, 1990, have been considered carefully and are rejected as duplicative of claims previously disallowed or claims addressed by this order.

far as it seeks lost investment yield. Claim "d(8)" is dismissed insofar as it seeks 4–percent interest.

5. The parties shall file a Joint Status Report by May 31, 1990, proposing a schedule that will accommodate by May 1991 a trial on all of plaintiff's remaining accounting claims that were not tried in 1978, as well as a schedule for briefing on the 1978 trial.